CATHERINE KING FOX, PLAINTIFF-APPELLANT, v. MYRTLE SNOW, ADMINISTRATRIX OF THE ESTATE OF WILLIAM GREEN, DEFENDANT-RESPONDENT.

Argued October 30, 1950—Decided December 4, 1950.

*Mr. Louis C. Friedman* argued the cause for the appellant; *Messrs. Ward, McGinnis & Friedman,* attorneys.

*Mr. Hugh C. Spernow* argued the cause for the respondent; *Messrs. Duffy & Ruggiero,* attorneys.

PER CURIAM. This cause is here on our own certification.

The case involves the construction of a paragraph of the will of Rosa E. Green, deceased, of the Borough of Haledon. The paragraph provided as follows:

"Third: I give and bequeath unto my husband, William L. Green all of the money which I have on deposit at the Paterson Savings and Trust Company, Paterson, New Jersey, however, any money which is in the said account at the time of my said husband's death, the said sum shall be held by my niece, Catherine King Fox, absolutely and forever."

The will was admitted to probate on April 25, 1949. The husband, William L. Green, died intestate on May 30, 1949. The legacy bequeathed under the paragraph in question is still on deposit in the Paterson Savings and Trust Company.

The question presented is whether William L. Green became the absolute owner of the money on deposit, the gift over to the plaintiff, Catherine King Fox, being void, or whether the husband took a life estate only and the fee vested in the niece.

The bequest to the husband was in general terms with an absolute power of disposal. Under such circumstances the gift over of the part not disposed of is void. As determined by Judge Grimshaw below, the husband, William L. Green, took an absolute ownership, an estate in fee, of the bank account. *Downey v. Borden,* 36 *N. J. L.* 460 (*E. & A.* 1872); *Tuerk v. Schueler,* 71 *N. J. L.* 331 (*E. & A.* 1904); *Gaston v. Ford,* 99 *N. J. Eq.* 592 (*Ch.* 1926); *Briggs v. Faulkner,*

120 *N. J. Eq.* 1 (*Ch.* 1936); *Trafton v. Bainbridge,* 125 *N. J. Eq.* 474 (*E. & A.* 1939).

Appellants ask this Court to explicitly and expressly overrule the long established law of this State. This we decline to do. Such action would be fraught with great danger in this type of case where titles to property, held by bequests and devises, are involved. A change of the established law by judicial decision is retrospective. It makes the law at the time of prior decisions as it is declared in the last decision, as to all transactions that can be reached by it. On the other hand a change in the settled law by statute is prospective only. *Stockton v. Dundee Manufacturing Co.,* 22 *N. J. Eq.* 56 (*Ch.* 1871).

The judgment of the Superior Court is affirmed.

VANDERBILT, C. J. (dissenting). I am constrained to dissent from the views of the majority of the court, first, because they apply to the case a technical rule of law to defeat the plain intent of the testatrix without serving any public policy whatever in so doing and, secondly—and this seems to me to be even more important—because their opinion involves a view of the judicial process, which, if it had been followed consistently in the past, would have checked irrevocably centuries ago the growth of the common law to meet changing conditions and which, if pursued now, will spell the ultimate ossification and death of the common law by depriving it of one of its most essential attributes—its inherent capacity constantly to renew its vitality and usefulness by adapting itself gradually and piecemeal to meeting the demonstrated needs of the times.

## I.

The controversy in the instant case centers around the third paragraph of the will of Rosa E. Green:

"Third: I give and bequeath unto my husband, William L. Green, all of the money which I have on deposit at the Paterson Savings and Trust Company, Paterson, New Jersey, however, any money which

is in the said account at the time of my said husband's death, the said sum shall be held by my niece, Catherine King Fox, absolutely and forever."

Not only is the meaning of this bequest entirely clear to any mind not encumbered with the involved and technical feudal lore of estates in fee simple, estates in fee tail and estates for life and the medieval doctrines of seisin and possession, but it is consonant with her entire testamentary plan. By the second paragraph of her will she gave her husband a life estate in her homestead with a remainder in fee to the plaintiff, her niece; by the fifth paragraph she named the plaintiff as her sole residuary legatee and devisee; by the sixth paragraph she designated the plaintiff's daughter to take her place and stead in the event that the plaintiff should predecease the testatrix; and by the seventh paragraph she named the plaintiff as her executrix.

By the words in the third paragraph, "any money which is in said account at the time of my said husband's death, the said sum shall be held by my niece, Catherine King Fox, absolutely and forever," the testatrix beyond any doubt intended that her husband could use up the bank account but that if he did not, the plaintiff should take what was left of it on his death. To hold otherwise is to proceed on the untenable assumption that the quoted words are meaningless and to ignore the elementary principle that the provisions of a will are not to be construed as meaningless except on the failure of every attempt to render them effective, *In re Fox*, 4 *N. J. 587*, 594 (*Sup. Ct.* 1950); *In re Fisler*, 133 *N. J. Eq.* 421, 425 (*E. & A.* 1943); *Shannon v. Ryan*, 91 *N. J. Eq.* 491, 494 (*E. & A.* 1920). This principle is an integral part of the most fundamental rule of testamentary construction, *i. e.*, the duty of the court is to ascertain what the intent of the testator was and, then, having ascertained it, to give it effect, *In re Fox, supra*, 4 *N. J.* 587, 593 (*Sup. Ct.* 1950); *Blauvelt v. Citizens Trust Co.*, 3 *N. J.* 545, 552 (*Sup. Ct.* 1950); *National State Bank of Newark v. Stewart*, 135 *N. J. Eq.* 603, 605 (*E. & A.* 1944); *Colwell v. Duffy*, 109 *N. J. L.* 423,

424 (*E. & A.* 1932); *Dennis v. Dennis,* 86 *N. J. Eq.* 423, 429 (*E. & A.* 1916); *Kent v. Armstrong,* 6 *N. J. Eq.* 637, 638 (*E. & A.* 1850). The intention of the testator in every case is, of course, subject to rules of public policy and statutory law, *National State Bank of Newark v. Stewart, supra,* 135 *N. J. Eq.* 603, 605 (*E. & A.* 1944), but when its objective is lawful, all arbitrary rules of construction must give way, *Colwell v. Duffy, supra,* 109 *N. J. L.* 423, 424 (*E. & A.* 1932). The distinction between the construction of wills and the construction of deeds is well summarized in *Shriver's Lessee v. Lynn, et al.,* 43 *U. S.* 43, 56 (1844):

"But there is a rule of construction applicable to all instruments, and especially to wills, that is, the intention of the parties, which should control any arbitrary rule however ancient may be its origin. * * * Where technical words are used in a deed of conveyance, the legal import of such words must govern. But there is no rule better established than that in giving a construction to a will the intention of the testator must prevail. His expressed intention constitutes the law, unless it shall conflict with some established legal principle."

Even Chancellor Kent concedes that "In the construction of devises, the intention of the testator is admitted to be the pole-star by which the court must steer," but then he inconsistently continues, "yet that intention is liable to be very much controlled by the application of technical rules, and the superior force of technical expressions," 4 *Commentaries on American Law* *537, a rule which may well apply to deeds, but which, as we have seen, has no place in the construction of wills.

In *Smith v. Bell,* 31 *U. S.* 68 (1832), a case very much like the one now under consideration, Chief Justice Marshall found it possible to give effect to the entire testamentary provision before him. In construing a clause in a will which read:

"I give to my wife, Elizabeth Goodwin, all my personal estate whatsoever and wheresoever, and of what nature, kind and quality soever, after the payment of my debts, legacies and funeral expenses, which personal estate I give and bequeath unto my said wife, Elizabeth

Goodwin, to and for her own use and benefit, and disposal absolutely; the remainder of the said estate after her decease, to be for the use of the said Jesse Goodwin."

the great Chief Justice Marshall had this to say with respect to the intent of the testator, at *p.* 74:

"These words give the remainder of the estate, after his wife's decease, to the son, with as much clearness as the preceding words give the whole estate to his wife. They manifest the intention of the testator to make a future provision for his son, as clearly as the first part of the bequest manifests his intention to make an immediate provision for his wife. If the first bequest is to take effect according to the obvious import of the words taken alone, the last is expunged from the will. The operation of the whole clause will be precisely the same as if the last member of the sentence were stricken out; yet both clauses are equally the words of the testator, are equally binding, and equally claim the attention of those who may construe the will. *We are no more at liberty to disregard the last member of the sentence than the first. No rule is better settled than that the whole will is to be taken together, and is to be so construed as to give effect, if it be possible, to the whole.* Either the last member of the sentence must be totally rejected, or it must influence the construction of the first so as to restrain the natural meaning of its words; either the bequest to the son must be stricken out, or it must limit the bequest to the wife, and confine it to her life. The limitation in remainder, shows that, in the opinion of the testator, the previous words had given only an estate for life. This was the sense in which he used them."

Instead of following this obviously sound method of testamentary construction our courts have been misled by the complex and artificial rules of the old common law of real property into accepting a technical rule of testamentary construction which gained seeming but altogether undeserved immortality from the opinion of Chancellor Kent in *Jackson v. Robins,* 16 *Johns.* 537 (*N. Y. Ct. App.* 1819), wherein he categorically stated at *p.* 588:

"* * * we may lay it down as an incontrovertible rule, that where an estate is given to a person generally, or indefinitely, with a power of disposition, it carries a fee; and the only exception to the rule is, where the testator gives to the first taker an estate for life only, by certain and express words, and annexes to it a power of disposal. In that particular and special case, the devisee for life

will not take an estate in fee, notwithstanding the distinct and naked gift of a power of disposition of the reversion."

The rule was later set down by Chancellor Kent in his Commentaries as settled law, 4 *Commentaries on American Law* *270 and *535, and has been followed by the New Jersey courts in a long line of decisions commencing with *Dutch Church at Freehold v. Smock, et al.,* 1 *N. J. Eq.* 148 (*Ch.* 1830), and including, *inter alia, Downey v. Borden,* 36 *N. J. L.* 460 (*E. & A.* 1872); *Tuerk v. Schueler,* 71 *N. J. L.* 331 (*E. & A.* 1904); *McCloskey v. Thorpe,* 74 *N. J. Eq.* 413 (*E. & A.* 1908); *Brohm v. Berner,* 95 *N. J. L.* 85 (*E. & A.* 1910); *Hyde v. Hyde,* 88 *N. J. Eq.* 358 (*E. & A.* 1917); and *Trafton v. Bainbridge,* 125 *N. J. Eq.* 474 (*E. & A.* 1939). It has likewise been subscribed to by courts in other jurisdictions, though significantly not without dissent, 75 *A. L. R.* 71-111.

If this rule is applied to the bequest here in question, it is apparent that the husband takes a fee and that consequently the limitation over, being inconsistent with the rights of the first taker, becomes invalid. But it is also apparent that this result is altogether contrary to the intention of the testatrix as clearly expressed in her will. By a technical rule of construction the latter half of the third paragraph of the will of the testatrix is thus as effectively blotted out of the will as if she had never written it. If the draftsman of the will knew of this technical rule of testamentary construction and still used language in the will which he knew would be abortive because of the rule (an assumption which in this case and doubtless in most cases where such language is used is contrary to fact) a fraud would have been perpetrated on the testatrix. If the draftsman was unaware of this technical rule, the effect upon the testatrix is the same. Of necessity, therefore, the rule operates to perpetrate a fraud on the testatrix.

John Chipman Gray, the foremost American authority on property law, in his *Restraints on the Alienation of Property* (*2d Ed.* 1895) 66, writes:

"It is to be observed that the rule is not a rule of construction, it is not a rule to carry out the intention of the parties, but its avowed purpose is to defeat that intention."

Because of the fact that in the instant case the clearly expressed intent of the testatrix has been thwarted by this obviously arbitrary and technical rule that owes its continuance to the magic of the name of Chancellor Kent, it is incumbent upon us to inquire closely into its nature in order to determine whether it is a rule necessitated by principles of public policy and founded upon good reason before which testamentary intent should rightly bow, or whether it is merely a rule remarkable only by its ancestry. Gray has stated the alleged reasons for the rule and their complete lack of validity with his customary incisiveness in his *Restraints on the Alienation of Property* (*2d Ed.* 1895), *supra:*

"What are the reasons given? They are, *First*, that the gift over is repugnant; *Second*, that the passage of a fee simple on death of the tenant intestate to the heirs is a necessary incident of the estate; *Third*, that an executory devise contingent upon a circumstance which it is in the power of the first taker to prevent happening is void. The first is the reason originally given [see *Ide v. Ide*, 5 *Mass.* 500 (1809)]; the second is the reason given by Fry, J., in *Shaw v. Ford* [7 *Ch. D.* 669 (1877)]; the third is Chancellor Kent's. But these are only words. They merely mean that the courts have set up a certain rule, and that the proposed provision is inconsistent with it; but why that rule should be set up, what interests are forwarded by it, how it helps the well-being, moral or material, of the community, the courts never show, and, to do them justice, never attempt to show. In the hundreds of pages in the reports on this subject, there is no suggestion that this rule tends to promote any good object." (*P.* 67.)

Stating that the rule is not a rule of construction to carry out the intention of the parties but that its aim and object is to defeat that intention, he observes:

"The courts always recognize this fact; and that no considerations of public policy are involved is shown by its being perfectly easy to carry out the desired result by a slight change of phrase. If you give a man a fee simple, you cannot provide that if he does not sell or devise it it shall go to T., but if you give him a life estate with power to appoint by deed or will, and in default of appointment to T.,

· the gift to T. is perfectly good. In both cases the intention is clear and undisputed; when you defeat the intention in one case, you are defeating exactly the intention that is preserved in the other." (*P.* 67.)

These observations apply equally to the whole line of decisions. in New Jersey which follow Chancellor Kent's rule. One may search them from the case of *Dutch Church at Freehold v. Smock, et al., supra,* 1 *N. J. Eq.* 148 (*Ch.* 1830), to *Traflon v. Bainbridge, supra,* 125 *N. J. Eq.* 474 (*E. & A.* 1939), without finding any good reason given for this technical rule that is relied upon in derogation of the cardinal rule of testamentary construction of seeking the testator's intent and its corollary that the language of the will is not to be construed as meaningless unless every attempt to render it effective fails.

Nor do Chief Justice Marshall and Gray stand alone in their opposition to the rule. Mr. Justice Holmes, the editor of the 13th edition of *Kent's Commentaries,* has this to say:

"It is difficult to perceive any good reason why the executory devise should not be considered valid, subject to be defeated by a disposition of all the property, just as a remainder after a life estate with a power of appointment is valid, but subject to be divested by an appointment." (*Vol.* 4 at *270.)

When one recalls that Mr. Justice Story sat with Chief Justice Marshall in *Smith v. Bell, supra,* 31 *U. S.* 68 (1832), it would appear that the weight of juristic authority as well as sound reasoning are against this rule which inevitably works a fraud on a testator.

That the rule is arbitrary and serves no public policy is perhaps best demonstrated by a few illustrations from our own decisions. In the instant case there was a devise to A generally or indefinitely, with absolute power of disposition, and on A's death a gift over to B. By the operation of Chancellor Kent's rule A gets a fee and the gift over is void, *Downey v. Borden, supra,* 36 *N. J. L.* 460 (*E. & A.* 1872); *Tuerk v. Schueler, supra,* 71 *N. J. L.* 331 (*E. & A.* 1904); *Hyde v. Hyde, supra,* 88 *N. J. Eq.* 358 (*E. & A.* 1917). A

would not have taken a fee, however, and the gift over to B would have been valid, if the devise had been to A for life, instead of generally and indefinitely, *Pratt v. Douglas,* 38 *N. J. Eq.* 516 (*E. & A.* 1884); *Wooster v. Cooper,* 53 *N. J. Eq.* 682 (*E. & A.* 1895); *Weaver v. Patterson,* 92 *N. J. Eq.* 170 (*Ch.* 1920); *Trafton v. Bainbridge, supra,* 125 *N. J. Eq.* 474 (*E. & A.* 1939); or if A's power of disposition had been limited instead of absolute, *Wright v. Wright,* 41 *N. J. Eq.* 382 (*Ch.* 1886); *Hensler v. Senfert,* 52 *N. J. Eq.* 754 (*Ch.* 1894); or even if the devise had been to A absolutely, or forever, or the like, but with only a power of testamentary disposition, *Kent v. Armstrong, supra,* 6 *N. J. Eq.* 637 (*E. & A.* 1850); *Cantine v. Brown,* 46 *N. J. L.* 599 (*E. & A.* 1884); *Kellers v. Kellers,* 79 *N. J. Eq.* 412 (*Ch.* 1911); affirmed on appeal, 80 *N. J. Eq.* 441 (*E. & A.* 1912); or to A absolutely, or forever, or the like, without any mention of a power of disposition, *Jones v. Stiles,* 19 *N. J. Eq.* 324 (*Ch.* 1868); *West Side Trust Co. v. Guiliano,* 106 *N. J. Eq.* 475 (*Ch.* 1930); *Higgins v. Mispeth,* 118 *N. J. Eq.* 575 (*Ch.* 1935); but see *Galante v. Silverstein,* 98 *N. J. Eq.* 52 (*Ch.* 1925); *Kutschinski v. Sheffer,* 109 *N. J. Eq.* 659 (*E. & A.* 1932). It is thus obvious that the plaintiff herein is denied her due; not because what the testatrix intended was illegal or impossible, but solely because the verbal formula used to express that intent ran afoul of this idiosyncrasy of the law.

## II.

The opinion of the majority of the court, like every other decision in this State on the subject, makes no attempt to justify the rule it perpetuates either in reason or on grounds of public policy. Despite the deleterious effects of the rule and the lack of any sound principle to support it, the majority maintains that it should not be overthrown, because it has been the long established law of this State and because overruling it "would be fraught with great danger in this type of case where titles to property, held by bequests and

devises, are involved" by reason of the retroactive effect of all judicial decisions. This view, if it had been consistently applied in the past, would have prevented any change whatever in property law by judicial decisions. There would have been, *e. g.,* no rule against perpetuities, no restraints on the alienation of property, no right to redeem mortgaged premises, no foreclosure of the equity of redemption, and so on endlessly. Every change in the law by judicial decision necessarily creates rights in one party to the litigation and imposes corresponding duties on the other party. This is the process by which the law grows and adjusts itself to the changing needs of the times.

The process is necessarily used not only to create new rights and corresponding duties but, where necessary, to strike down old ones. *Cessante ratione legis, cessat et ipsa lex* (the reason for a law ceasing, the law itself ceases) is one of the most ancient maxims known to our law and it is constantly followed by our courts. Of this maxim it was said in *Beardsley v. City of Hartford,* 50 *Conn.* 529, 47 *Am. Rep.* 677, 682 (1883), "This means that no law can survive the reason on which it is founded. It needs no statute to change it; it abrogates itself." The same thought was enunciated by Lord Coke in *Milborn's Case,* 7 *Coke* 7a (*K. B.* 1609) : *"Ratio legis est anima legis, et mutata legis ratione, mutatur ex lex"* (the reason for a law is the soul of the law, and if the reason for a law has changed, the law is changed). "It is revolting," says Mr. Justice Holmes, "to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past," and "To rest upon a formula is a slumber that, prolonged, means death." *Collected Legal Papers* (1920) 187, 306. Holdsworth, in commenting on this quotation from Mr. Justice Holmes, has described how the Anglo-American system of case law has enabled "the judges, within fairly wide limits, to apply to old precedents a process of selection and rejection which

brings the law into conformity with modern conditions." "This process of selection and rejection," he says, "has been applied to the law laid down in the Year Books; and generally the rules there laid down, which are still part of our modern law, have survived because they suit modern needs." *Essays in Law and History* (1946) 161, 162. It is as important to the growth of the law that it should have the inherent power to cast off outmoded or erroneous rules of law as that it have the capacity for developing new doctrines suited to the needs of the times. The only difference between these two phases of the same process is that the one proceeds almost automatically out of sheer necessity and often without any open admission that new law is being created, while the other involves an open recognition of past mistakes or an express repudiation of a rule once sound but now outmoded. Unfortunately, it is not considered in good judicial taste to overrule erroneous or outworn doctrines *sub silentio*.

To hold, as the majority opinion implies, that the only way to overcome the unfortunate rule of law that plagues us here is by legislation, is to put the common law in a self-imposed straitjacket. Such a theory, if followed consistently, would inevitably lead to the ultimate codification of all of our law for sheer lack of capacity in the courts to adapt the law to the needs of the living present. The doctrine of *stare decisis* neither renders the courts impotent to correct their past errors nor requires them to adhere blindly to rules that have lost their reason for being. The common law would be sapped of its life blood if *stare decisis* were to become a god instead of a guide. The doctrine when properly applied operates only to control change, not to prevent it. As Mr. Justice Cardozo has put it, "Few rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end. If they do not function they are diseased. If they are diseased, they must not propagate their kind. Sometimes they are cut out and extirpated altogether. Sometimes they are left with the shadow of continued life, but sterilized, truncated, impotent for harm." *Nature*

*of the Judicial Process* (1921) 98. All lawyers as well as laymen have a perfectly natural longing to think of the law as being as steadfast and immutable as the everlasting hills, but when we face the realities, we must agree with Dean Pound when he says, "Law must be stable, and yet it cannot stand still." *Interpretations of Legal History* (1923) I, and with Professor Williston when he tells us, "Uniform decisions of 300 years on a particular question may, and sometimes have been overthrown in a day, and the single decision at the end of the series may establish a rule of law at variance with all that has gone before." *Some Modern Tendencies in the Law* (1929) 125. The most drastic and far-reaching example of what Professor Williston had in mind was the overturning of the entire *corpus* of federal common law through the overruling of *Swift v. Tyson,* 16 *Peters* 1 (1842), by *Erie Railroad Co. v. Tompkins,* 304 *U. S.* 64 (1938).

Particularly in the realm of testamentary construction should the courts feel free to depart from precedent when the dictates of justice and reason demand it. Even Chancellor Kent was of this opinion: "Though we are not to disregard the authority of decisions, even as to the interpretation of wills, yet it is certain that the construction of them is so much governed by the language, arrangement, and circumstances of each particular instrument, which is usually very unskill-fully and very incoherently drawn, that adjudged cases become of less authority, and are of more hazardous application, than decisions upon any other branch of the law." 4 *Commentaries on American Law* *535. "Blind adherence to precedent as respects the meaning of a particular phrase is fraught with peril to the testamentary design, for, as said, intention is to be gathered from the instrument as a whole, and it rarely happens that the wills are substantially alike." *National State Bank of Newark v., Stewart,* 135 *N. J. Eq.* 603, 605 (1944). See also Clapp's *New Jersey Practice, Wills and Administration* (1950) 236. Even in England where the doctrine of the judicial infallibility of the House of Lords has prevailed for a century, we find Lord Chancellor Simon declaring in the

case of *Perrin v. Morgan* (1943), 1 *All E. R.* 187, 194; when an ancient and well established rule of testamentary construction was urged upon the court:

"The present question is not, in my opinion, one in which this House is required on the ground of public interest to maintain a rule which has been constantly applied but which it is convinced is erroneous. It is far more important to promote the correct construction of future wills in this respect than to preserve consistency in misinterpretation."

The dangers that the majority fear, it is submitted, are more apparent than real. The doctrine of *stare decisis* tends to produce certainty in our law, but it is important to realize that certainty *per se* is but a means to an end, and not an end in itself. Certainty is desirable only insofar as it operates to produce the maximum good and the minimum harm and thereby to advance justice. The courts have been reluctant to overthrow established rules when property rights are involved for the simple reason that persons in arranging their affairs have relied upon the rules as established, though outmoded or erroneous, and so to abandon them would result sometimes in greater harm than to observe them. The question whether the doctrine of *stare decisis* should be adhered to in such cases is always a choice between relative evils. When it appears that the evil resulting from a continuation of the accepted rule must be productive of greater mischief to the community than can possibly ensue from disregarding the previous adjudications on the subject, courts have frequently and wisely departed from precedent, 14 *Am. Jur., Courts,* § 126.

What then, are the relative evils in the instant case? First, we should consider the evils that will result from a perpetuation of the rule here involved. It has already been demonstrated that the rule, in each and every instance in which it is applied, results in a complete frustration of the legitimate intention of the testator. It can only operate to take property from one to whom the testator intended to give it and to bestow it upon another. There is a further evil, moreover,

resulting from the very existence of the rule. As Professor Gray has put it in his *Restraints on the Alienation of Property* (2d ed. 1895) 68, *supra:*

"It is often a question of the greatest difficulty to determine whether a testator has given a devisee a life estate with general power of appointment, or whether he has given him a fee with an executory devise over in case the first taker shall not dispose of his interest. If it were not for this rule, that question would almost never become material. But now that a testator's intention, if expressed in one form, cannot be carried out, while it can be, if expressed in another, the question becomes of vital importance, and consequently this arbitrary rule is responsible for an enormous amount of litigation."

Bearing out this observation, an annotation in 75 *A. L. R.* 71-111, entitled "Devise or bequest which does not state character or duration of estate but purports to dispose of what remains at death of devisee or legatee, as creating a fee or life estate," cites 386 cases of which 28 are from New Jersey, and we cannot even hazard a guess as to the number of additional cases, reported and unreported, in which the rule was involved. That a rule has been so productive of unnecessary litigation is in itself strong proof of its undesirability.

Having considered the evils flowing from continuing to follow the rule, let us now inquire into the evils, if any, which might result from its rejection. It is pertinent at this point to recall the words of Mr. Justice Cardozo minimizing the effect of overruling a decision: "The picture of the bewildered litigant lured into a course of action by the false light of a decision, only to meet ruin when the light is extinguished and the decision is overuled, is for the most part a figment of excited brains." *The Nature of the Judicial Process* (1921) 122. The rule in question by its very nature is never relied upon by those who are seeking to make a testamentary disposition of their property, for if the rule were known to a person at the time of the drawing of his will, its operation would and could be guarded against by the choice of words appropriate to accomplish the result desired. This rule is truly subversive of the testator's intent. It is relied upon only after the testator's decease by those who seek, solely on the basis

of its technical and arbitrary requirements, to profit from the testator's ignorance and to take his property contrary to his expressed desires. Certainly it is not unjust or inequitable to deny such persons resort to this rule. There are three possible factual situations to be considered in weighing the retroactive effect of overturning this rule. First, where a will has already been the subject of legal proceedings, property rights determined by a judgment entered therein are beyond the reach of any change in the law. Such a judgment is *res judicata*. Second, where a will has been executed, but the testator is still living, or if dead, the clause similar to the one in question has not yet been construed by the courts, the "evil" caused by the overthrow of the rule will be to carry out the testator's intent. No existing will need be changed by a decision doing away with the old rule, since its overturning merely permits the expressed intent of the testator to be given effect. Third, where persons have not now, but may in the future execute wills, no harm can result from overthrowing the rule, for they have neither to forget an old rule nor to learn a new one in order to insure the carrying out of their testamentary plan. In the absence of the rule their intentions, as naturally though perhaps inexpertly expressed, will govern.

Thus it would appear that the dangers envisioned from overthrowing this rule are not present here and that the evils resulting from its continuation are great. This being so, should there be hesitation in rejecting this rule merely because it is old? To recognize a rule solely because it has long been the law "would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and the Persians." *Hurtado v. California,* 110 *U. S.* 516, 529 (1883). We should not permit the dead hand of the past to weigh so heavily upon the law that it perpetuates rules of law without reason. Unless rules of law are created, revised, or rejected as conditions change and as past errors become apparent, the common law will soon become antiquated and ineffective in an age of rapid

economic and social change. It will be on its way to the grave. In the instant case the rule applied by the court below should be rejected and effect should be given to the testator's intention that the plaintiff have the bank account in question.

*For affirmance*—Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Chief Justice VANDERBILT—1.