153 N.J. Super. 377 (1977)
379 A.2d 1046
MARILYN LYNN, PLAINTIFF,
v.
ROBERT LYNN, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 25, 1977.
*379 Messrs. Wharton, Stewart & Davis for plaintiff (Mr. Richard H. Thiele, Jr., appearing).
Messrs. Halpern, Schachter & Wohl for defendant (Mr. Michael S. Halpern, appearing).
IMBRIANI, J.C.C.
This matrimonial case presents two issues. First, should an adulterous wife be awarded alimony? Second, may a father voluntarily reduce his income and thereby diminish his alimony and child support obligations?
The parties separated April 6, 1975. On December 12, 1975 the wife filed a complaint for separate maintenance seeking support for herself and three children, who are all in her custody and presently 12, 10 and 8 years of age. The husband filed a countersuit for divorce on the grounds of adultery. She then filed an amended complaint seeking divorce, alleging his desertion and adultery.
The husband, age 43, is a medical doctor who specialized in hematology oncology, i.e., the practice of treating those afflicted with cancer. His practice was very lucrative. In 1974 and 1975 his net income was $80,000, increasing to $113,000 in 1976. On July 1, 1977, while this divorce action was pending, he sold his practice to accept a full-time, three-year residency in psychiatry at St. Luke's Hospital in New York City. His salary and sole income for the next three years will be $17,000.
The husband testified that his practice, while very lucrative, was depressing and drained him both psychologically and emotionally. All of his patients suffered from terminal illnesses; most lived for less than five years. He described his emotional trauma in communicating with his patients *380 and their loved ones. Many relatives wrote him notes of appreciation after the passing of his patient. While touching, they only increased his distress and depression. He viewed himself as being nothing more than a "money making machine" who merely extended the lives of his patients for a few years. He said he was denied the satisfaction enjoyed by others in his profession of being able to cure or at least stabilize the ills of their patients.
He needed and sought solace. He said his wife could not or would not understand his problems. She reveled in their wealth by spending lavishly. Yet, in spite of such substantial income, the parties had virtually no savings, other than the proceeds from the sale of the marital home and his medical practice.
The wife admitted to many acts of adultery, commencing within "a few months" after her husband left the marital residence; many occurred in the marital home which her husband was maintaining pursuant to pendete lite orders. Once her child entered her bedroom and saw her in bed with another man.
This court finds that the husband deserted his wife and that she committed adultery. A dual divorce is granted to both parties upon those grounds. The wife did not prove by a preponderance of the evidence that the husband also committed adultery.
The first question is whether alimony should be granted an adulterous wife?
There is no statute mandating denial of alimony to one who has committed a matrimonial wrong. But it may be considered.
In all actions for divorce other than those where judgment is granted solely on the ground of separation the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just. [N.J.S.A. 2A:34-23]
Yet, the usual practice in New Jersey has been to allow alimony to a spouse in spite of her having committed a marital *381 offense. Note Altbrandt v. Altbrandt, 129 N.J. Super. 235 (Ch. Div. 1974). Consequently, the matrimonial bar was taken aback by Mahne v. Mahne, 147 N.J. Super. 326 (App. Div. 1977), certif. den., July 12, 1977, when that court cited with approval 24 Am.Jur.2d, Divorce and Separation, § 622 at 744, that it is "an almost universal rule that permanent alimony will be denied to a wife who is guilty of adultery" and set aside a provision in a judgment of divorce granting alimony to an adulterous wife. It was not clear whether that holding applied to all cases where the wife committed any matrimonial offense, or only where the offense was adultery, or only where the offense was an "outrageous" adultery. Some clarification soon arrived when Nochenson v. Nochenson, 148 N.J. Super. 448, 449 (App. Div. 1977), held that "Mahne went no further than accepting fault as a `consideration' or factor in determining the grant or denial of alimony."
Surprisingly, the cases are not clear as to when fault should be considered, and if so, to what extent. Cf. Greenberg v. Greenberg, 126 N.J. Super. 96 (App. Div. 1973). If considered, should the court deny alimony in toto or merely reduce the amount of alimony? Contrawise, what results should flow if the party ordered to pay alimony committed the matrimonial offense? Should the court then grant alimony in excess of what is reasonable so as to punish or penalize the offending spouse? Turi v. Turi, 34 N.J. Super. 313 (App. Div. 1955), says no. Or what result should flow if, as occurred here, both parties were at fault? We may well be on the threshold of a new era in dealing with alimony and on the verge of finally giving real meaning and substance to N.J.S.A. 2A:34-23.
At common law the granting of alimony was within judicial discretion. Although now permitted by statute, the sum to be awarded is still left to judicial discretion. N.J.S.A. 2A:34-23. So perhaps we should start at the beginning and ask what are the reasons for the granting of alimony? *382 If outmoded or an anachronism, the court should develop new doctrines. It should never "adhere blindly to rules that have lost their reason for being." Fox v. Snow, 6 N.J. 12, 23 (1950) dissent of Chief Justice Vanderbilt. It is an ancient maxim that once the reason for a rule ceases, the rule itself must cease.
What are the reasons for the granting of alimony? This court finds primarily two. One, to permit the wife, who contributed during marriage to the accumulation of the marital assets, to share therein. And second, to prevent her from becoming a public charge.
Patently, the first reason has essentially vanished with the enactment of N.J.S.A. 2A:34-23 mandating equitable distribution of all assets acquired during the marriage, albeit there will be instances where the contributions of a wife to the marriage cannot feasibly be subject to equitable distribution. For instance, a wife may contribute to the professional development of her husband by working while he attends college and acquires a potential for substantial earnings. In such a case the parties may divorce early and they may not have acquired significant assets as of the time of a divorce. Surely in those circumstances alimony should be utilized as a device to enable the wife to share equitably in what she has contributed to the marriage. Although this plaintiff-wife worked for a short period while her husband acquired his medical education, considering the long period between his graduation and the filing of her complaint, this case does not call such principles into play.
The concern of a wife becoming a public charge has waned with the passage of time. While women were formerly excluded from the employment market, then accepted on a limited basis, they are now widely accepted by industry. This is not to say that their opportunities are equal to those of men, but patently the job market for women has grown impressively.
This court is not suggesting the abolition of alimony. That is a matter within the jurisdiction of the Legislature. But *383 where fault of the wife exists, and the statute permits it to be considered by the court, we may have reached the stage where alimony should be denied, unless necessary to prevent a wife from becoming a public charge or in those instances mentioned above to equitably distribute assets.
But such a departure from the past should not emanate from a trial court. However, we need not go that far to decide this case.
While glossed over in the past, we must say the obvious. Adultery is a crime. N.J.S.A. 2A:88-1. Other than an adulterous wife, this court knows of no other litigant who is permitted to profit from the commission of a crime.
The nexus of this case is whether there is a reasonable probability that this wife could become a public charge if denied alimony. Let us turn to the facts. She is a 39-year-old college graduate who taught for six years in public schools some 13 years ago. While she may need a refresher course, the testimony is that she has been employed during the past year as substitute teacher. She should be able to return to that vocation. Not only has this woman a potentiality to earn a fair salary, but she is endowed with some money of her own (a small trust fund) and will receive a fair sum as equitable distribution of the marital assets. It should be noted in passing that the court does not believe that she cannot or should not enter the employment market because she will be entrusted with the care of three minor children. Many women have overcome such a burden and so can this plaintiff. Thus, this court finds that there is very little probability of this woman becoming a public charge.
Mahne certainly stands for the proposition that alimony sould be disallowed where the wife has committed an outrageous adultery. That is precisely what occurred here. The wife, while receiving pendente lite alimony and support of $30,000 a year, and living in the marital home which the husband was maintaining, committed adultery within that marital home. On at least one occasion an infant son saw something he should not have seen.
*384 Under these circumstances alimony to the wife is wholly unjustified and, accordingly, denied. It is no excuse or justification that the adultery was subsequent to her being deserted. The marital wrong of one spouse cannot justify adultery by the other.
The second question is, may a father voluntarily and substantially reduce his income and thereby diminish his support obligations? Now we are concerned only with support of his children.
The wife understandably questions her husband's motives. She asserts that even if he acted in "good faith," a court of equity must consider whether her husband had a right to make such a choice and abandon his societal obligations.
The husband denies a malevolent motive. He submits that he was subjecting himself to an emotional and psychological breakdown if his life did not take a new direction. He really is not abandoning his career, but rather has entered the related field of treating the emotional and psychological needs of terminally ill patients and their families. He believes that not only will his new life be more satisfying, but eventually may well be as financially lucrative as the practice he abandoned. This is merely a shift of emphasis within the same profession.
We must start with the reality that the husband is presently earning $17,000 and will continue to do so for the next three years. Certainly this court cannot order him to abandon his residency in psychiatry and re-enter the practice of hematology oncology. The only practical relief we can furnish the children is to supplement their support from his salary by resorting to his capital assets, most of which he will be entitled to receive pursuant to equitable distribution of the marital assets.
While the precise impact of federal and state income taxes from the recent sales of the marital abode and oncology practice are not clear, it would appear that the total of assets *385 subject to equitable distribution after taxes will be approximately $125,000.
The husband argues that support for his children should be determined only with reference to his present earnings, i.e., $17,000. The statute speaks of his "ability to pay." N.J.S.A. 2A:34-23.
Generally, in determining support courts consider the potential or ability of a husband to earn, rather than his actual income. See 24 Am.Jur.2d Divorce and Separation, § 632 at 754; "Change in Financial Condition or Needs of Husband or Wife as Ground for Modification of Decree for Alimony or Maintenance," 18 A.L.R. 2d 10, 14-15 (1951). New Jersey has long recognized that alimony is to be determined by a husband's fair ability to produce and not exclusively by his actual means. See Dietrick v. Dietrick, 88 N.J. Eq. 560 (E. & A. 1918); Turi v. Turi, 34 N.J. Super. 313 (App. Div. 1955), where the court spoke of defendant's capacity to earn as well as his actual income; Fern v. Fern, 140 N.J. Super. 121 (App. Div. 1976), where husband was compelled to pay alimony of $200 a week even though he resigned his $20,000 a year position as president of a corporation in which he controlled 78% of the common stock to become a consultant to that same corporation for $100 a week.
Our sister states have reached a similar conclusion. See Saltzman v. Saltzman, 54 A.D.2d 861, 388 N.Y.S.2d 605 (App. Div. 1976), where a dentist abandoned a $300-a-week practice to go to California, where he was not working but studying for its dental examination, and the court said (at 606): "[t]he husband's voluntary abandonment of gainful employment does not bar the court from granting the wife alimony based upon the income the husband is capable of earning by honest efforts," and Reed v. Reed, 260 Iowa 1166, 152 N.W.2d 190 (Sup. Ct. 1967), where husband left job with a $420-a-month salary to enter college. *386 Commendable as it may otherwise be, the self-imposed termination of employment by any person in order to obtain more schooling cannot be looked upon with favor when it is detrimental to his child's best interests and at the resultant expense of a former spouse. [152 N.W.2d at 191]
This court finds as a fact that the husband acted in good faith in abandoning his lucrative medical practice. His motives are understandable and justified. See Thomas v. Thomas, 281 Ala. 397, 203 So.2d 118 (Sup. Ct. 1967), where the husband, although having a $60,000 a year medical practice, was inundated with huge debts, so he left to become a prison physician for $8,400 a year. The court said:
There are many reasons that might influence a man to change his occupation other than the financial aspects. The prospect of improving his professional competence is a strong one. The prospect of leading a more satisfying life is not to be ignored. [203 So.2d at 123]
Nonetheless, the timing of this defendant to enter a new career will compel a substantial reduction in the living standards of his children  this at a time when their needs have and will continue to grow. It is irrelevant that his present income of $17,000 is greater than that of 80% of our citizens (as he suggests) and sufficient to satisfy all of the basic needs of his children who will not do without. Under the circumstances of this case, equity dictates that the financial suffering which will flow from his decision should be visited upon defendant and not his children.
Here we have a case where invasion of the husband's capital assets, together with funds derived from his income, will be sufficient to maintain the children's present style of living and still enable the husband to pursue his new profession. Equity dictates that a trust be impressed upon the husband's share of equitable distribution and used to supplement support payable from his now reduced income. This approach is by no means novel. Painter v. Painter, 65 N.J. 196, 212-213 (1974), said that a matrimonial judge should *387 "view sympathetically a resort to the trust device, with its great flexibility." Since the husband will be in residency for three years and until the summer of 1980, the trust shall continue until December 31, 1980. By that time the husband should enter his new profession and support can be reviewed.
The utilitarianism of a trust is manifest. It negates the risk of the husband dissipating his funds during the critical period when additional support is needed, assures prompt payments of support with a minimum of judicial intervention, and enables the husband to plan his own budget for the next three years without being unduly burdened with support obligations.
The assets subject to equitable distribution shall be divided equally between the parties, other than personal property within the former marital home, which shall be distributed on the basis of need. The wife shall receive her share as soon as is practicable; otherwise she would be compelled to pay for the obligations of her husband. But since some of the assets will not be received until next year and the precise computation of taxes due cannot be made at this time, she shall not receive her full share until May 1, 1979, when the full amount of taxes, whether or not then due, can be ascertained with some certainty. All marital assets shall be paid to a trustee, who shall reimburse both parties "off the top" for any income taxes each must pay thereon. It should be noted that some of the marital assets will be treated as ordinary income for federal income tax purposes and others as capital assets.
Postponement of any distribution at this time will undoubtedly visit hardship upon both the parties, especially the wife. For that reason, the trustee shall distribute forthwith $25,000 to the wife and $10,000 to the husband. The wife shall receive an additional payment of $20,000 on May 1, 1978 and the balance of her full share on May 1, 1979.
Support shall be paid for each child in the amount of $125 a week until emancipated; of this sum the husband *388 shall pay $50 a week from his income and the remaining $75 from his share of the trust fund.
At the termination of the trust, the then balance of the trust fund shall be paid to the husband and the full support of $125 a child shall be paid by the husband from his then earnings and income, subject of course to either party petitioning for a review of support at that time. If for any reason the trust fund shall be dissipated prior to termination, the husband shall be obligated to pay the full amount of support.