924 A.2d 484

IN RE LEAD PAINT LITIGATION.

Argued November 28, 2006—Decided June 15, 2007.

*Ezra D. Rosenberg* argued the cause for appellants, American Cyanamid Co.; Atlantic Richfield Company; Cytec Industries,

Inc.; E.I. duPont de Nemours and Company, ConAgra Grocery Products Company; Millenium Inorganic Chemicals Inc.; NL Industries, Inc. and Sherwin–Williams Co. (*Dechert*, attorneys for Atlantic Richfield Company; *Coughlin Duffy*, attorneys for American Cyanamid Co. and Cytec Industries, Inc.; *Riker, Danzig, Scherer, Hyland & Perretti*, attorneys for E.I. duPont de Nemours and Company; *Lowenstein Sandler*, attorneys for ConAgra Grocery Products Company; *Porzio, Bromberg & Newman*, attorneys for Millenium Inorganic Chemicals Inc.; *McCarter & English*, attorneys for NL Industries, Inc. and *Herrick, Feinstein*, attorneys for Sherwin–Williams Co.; *Mr. Rosenberg, Joyce Chen Shueh, Timothy I. Duffy, David W. Field, Anne M. Patterson, Lauren E. Handler, Steven P. Benenson, Andrew T. Berry and Ronald J. Levine*, on the briefs).

*Fidelma Fitzpatrick*, a member of the Rhode Island, Massachusetts, New York and District of Columbia bars and Michael Gordon argued the cause for respondents, City of Bayonne; City of Camden; Borough of Collingswood; Cumberland County; City of East Orange; County of Essex; City of Gloucester; Gloucester County; Borough of Highland Park; Township of Hillside; Township of Irvington; City of Jersey City; City of Linden; City of Newark; Borough of North Plainfield; City of Orange; City of Passaic; Town of Phillipsburg; City of Plainfield; Borough of Roselle; Borough of Roselle Park; City of Union City; County of Union; Township of Union; Town of West New York and Township of West Orange (*Gordon & Gordon*, attorneys for City of Newark and Township of West Orange; *Morris G. Smith and Florio, Perrucci, Steinhardt & Fader*, attorneys for City of Camden; *Florio, Perrucci, Steinhardt & Fader*, attorneys for Borough of North Plainfield; City of Gloucester; Town of Phillipsburg; Borough of Collingswood and County of Gloucester; *Florio, Perrucci, Steinhardt & Fader and Hobbie, Corrigan, Bertucio & Tashjy*, attorneys for City of Plainfield; *Jon L. Gelman, Michael P. Burakoff and Scarinci & Hollenbeck*, attorneys for City of Bayonne; City of Jersey City; City of Passaic; City of Union City and Town of West New York; *Mr. Gelman, Mr. Burakoff, James J. Plaia and Marvin T. Braker*, attorneys for City of Orange;

*Basile & Testa,* attorneys for County of Cumberland; *Mr. Gelman, Mr. Burakoff and Bross, Cummings & Pereira,* attorneys for Township of Irvington and County of Essex; *Bross, Cummings & Pereira,* attorneys for City of East Orange; *Mr. Gelman, Mr. Burakoff and Mr. Plaia,* attorneys for City of Linden; Township of Hillside; Borough of Roselle; Borough of Roselle Park; County of Union and Borough of Highland Park; *Ms. Fitzpatrick, Mr. Gordon, Mr. Smith, Mr. Burakoff, Mr. Gelman, Mr. Plaia, Mr. Braker, Michael J. Perrucci, Glenn A. Clouser, Norman M. Hobbie, Jacqueline DeCarlo, Michael L. Testa, Michael Bross, Sheldon Bross and Steven L Schepps,* on the brief).

*Ronald K. Chen,* Public Advocate of New Jersey, argued the cause for *amicus curiae* Public Advocate.

*Michael J. Haas,* Assistant Attorney General, argued the cause for amicus curiae Department of Health and Senior Services (*Stuart Rabner,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Rachana R. Munshi and Melissa H. Raksa,* Deputy Attorneys General, on the brief).

*Steven J. Picco* submitted a brief on behalf of amicus curiae Chemistry Council of New Jersey (*Reed Smith,* attorneys).

*Kenneth J. Wilbur* submitted a brief on behalf of amici curiae Johnson & Johnson, New Jersey Business & Industry Association, New Jersey State Chamber of Commerce and Commerce and Industry Association of New Jersey (*Drinker Biddle & Reath,* attorneys).

*David G. Evans* submitted a brief on behalf of amicus curiae Pacific Legal Foundation.

*Stacy Alison Fols* submitted a brief on behalf of amicus curiae Product Liability Advisory Council, Inc. (*Montgomery, McCracken, Walker & Rhoads,* attorneys).

Justice HOENS delivered the opinion of the Court.

In these consolidated complaints, twenty-six municipalities and counties seek to recover, from manufacturers and distributors of

lead paints, the costs of detecting and removing lead paint from homes and buildings, of providing medical care to residents affected with lead poisoning, and of developing programs to educate residents about the dangers of lead paint. Although the complaints initially sought recovery through a wide variety of legal theories, we are called upon to consider only whether these plaintiffs have stated a cognizable claim based on the common law tort of public nuisance. Because we conclude that plaintiffs cannot state a claim consistent with the well-recognized parameters of that tort, and because we further conclude that to find otherwise would be directly contrary to legislative pronouncements governing both lead paint abatement programs and products liability claims, we reverse the judgment of the Appellate Division and remand for dismissal of the complaints.

## I.

This litigation began on December 14, 2001, when the City of Newark and its mayor filed a complaint asserting claims sounding in fraud, public nuisance, civil conspiracy, unjust enrichment, and indemnification. Named as defendants were a large number of companies that had manufactured lead pigments or lead paints, or that were the corporate successors to the manufacturers of those products.[1] Shortly thereafter, twenty-five other plaintiffs[2] filed

---

[1] The City of Newark complaint identified American Cyanamid Company, Atlantic Richfield Company, ConAgra Grocery Products Company, Cytec Industries, Inc., E.I. duPont de Nemours and Company, Millennium Inorganic Chemicals Inc., NL Industries, Inc., and The Sherwin–Williams Company as defendants (collectively "defendants"). Although other entities were also named as defendants, they have not participated in the litigation or in the appeal.

[2] Plaintiffs, other than the City of Newark, are City of Bayonne, City of Camden, Borough of Collingswood, Cumberland County, City of East Orange, County of Essex, City of Gloucester, Gloucester County, Borough of Highland Park, Township of Hillside, Township of Irvington, City of Jersey City, City of Linden, Borough of North Plainfield, City of Orange, City of Passaic, Town of Phillipsburg, City of Plainfield, Borough of Roselle, Borough of Roselle Park,

complaints similar to the one filed by the City of Newark. By order dated February 11, 2002, this Court designated "all pending and future litigation involving damages or other relief arising out of the manufacture, sale, distribution and/or use of lead-based paint" as a mass tort. *See R.* 4:38A. Pursuant to that order, all of the complaints were transferred to a single vicinage and assigned to one judge for management.

### A.

Defendants moved to dismiss the complaints for failure to state a claim on which relief could be granted. *See R.* 4:6–2(e). After briefing and oral argument, the trial court issued an order granting defendants' motion, accompanied by a lengthy written decision.[3]

The trial court rejected the complaint both generally and based upon a count-by-count analysis. As a general proposition, the trial court concluded that because plaintiffs are municipalities and similar governmental entities, they had only such powers as are granted to them by statute or our constitution. Viewed in that light, the trial court first criticized plaintiffs' complaints generally as overstepping those powers, referring to the complaints as "seek[ing] an unwarranted and impermissible expansion of [plaintiffs'] role as local government entities to act on behalf of the public." The trial court therefore found that these plaintiffs were

---

County of Union, Township of Union, City of Union City, Town of West New York, and Township of West Orange.

[3] The trial court granted defendants' motion to dismiss plaintiffs' claims based on theories of public nuisance, fraud, unjust enrichment, indemnification, and civil conspiracy, concluding that the facts as alleged were insufficient to state a claim when tested against any of those causes of action. The Appellate Division reversed only the dismissal of the public nuisance claim, affirming all of the trial court's other conclusions. Plaintiffs did not file a petition for certification to challenge the dismissal of the counts for relief based on their other theories. We therefore do not address those claims.

not authorized to maintain the action, regardless of any of the particular theories asserted.

The court also addressed each of those theories, and, in particular, rejected plaintiffs' argument that their complaints sounded in public nuisance. First, noting that plaintiffs drew their support for this theory of recovery from the legislative declaration of public nuisance contained in the Lead Paint Act, the court reasoned that all of the damages plaintiffs sought to recoup would be barred by the municipal cost recovery doctrine. Second, the trial court reasoned that all of defendants' acts that plaintiffs asserted gave rise to their public nuisance claims were, in reality, governed exclusively by products liability theories. Third, the court reasoned that the Legislature, in enacting the Lead Paint Act, intended to act comprehensively, with the result that other remedies, including the common law remedy of public nuisance, were not available to these plaintiffs. Finally, the trial court rejected the complaints based upon a proximate cause analysis, reasoning that defendants' lack of control of the premises where the nuisance could be found was fatal to plaintiffs' recovery of damages.

## B.

The Appellate Division's analysis of the public nuisance claim led it to reach the opposite conclusion. First, the appellate panel rejected the trial court's conclusion that "to permit this action to proceed would offend the constitutional principle of separation of powers by sanctioning a remedial process independent of that created by the Legislature" when it enacted the Lead Paint Act. Instead, the panel reasoned that permitting plaintiffs' public nuisance claim "to proceed would not subvert the goals of the [Legislature], .... [because it would] proceed on a parallel track that need not ever intersect with the mechanism set forth" by the Legislature. In so concluding, the panel utilized a preemption analysis and coupled it with the observation that "[a]bsent [an] express limitation, courts must assume that the statute was not intended to bar any [inconsistent] common-law remedy." Refer-

ring to the goals of the complaints as "complementary" to the remedies authorized by the Lead Paint Act, the panel found no separation of powers violation.

The Appellate Division also rejected the trial court's municipal cost recovery rule analysis, questioning the continued viability of that theory and its application to public nuisance claims. Having therefore rejected the trial court's general grounds for dismissing the complaints, the panel then turned to a discussion of the trial court's more specific conclusions about the viability of this public nuisance claim.

In analyzing the parameters of a public nuisance claim, the panel held that parties, like defendants, may be liable for a public nuisance even if those parties do not control, at the time the nuisance is created or exists, the instrumentality causing the nuisance or the property where the nuisance is found. Thus, the Appellate Division held that a public nuisance claim is permissible even if the only allegation is that defendants failed to advise of the risks associated with an ordinary consumer product lawfully made and sold decades before. In doing so, the panel reasoned that public nuisance no longer requires proof of defendants' interference with the use of land, with the result that the legal theory could extend to the activities of these defendants.

As part of this analysis, the panel rejected the assertion that plaintiffs were impermissibly suing on behalf of third parties harmed by lead paint. Instead, it found that plaintiffs had suffered "their own, unique damages." The panel, however, did not address whether a public entity could sue for damages caused by a public nuisance only if it could allege that it had sustained "special damages" as that term is utilized in public nuisance doctrine.

In addition, the appellate panel rejected defendants' alternate argument that plaintiffs' claims were governed by, and therefore precluded by, the Product Liability Act (PLA), *N.J.S.A.* 2A:58C–1 to–11. Although conceding that plaintiffs alleged that defendants were liable because they had failed to disclose or warn of the products' dangers, the panel found no bar to plaintiffs' public

nuisance claim as a result. Rather, the panel reasoned that the claims were excluded from the scope of the PLA because of that statute's exception for environmental tort actions. *See N.J.S.A.* 2A:58C–6.

Finally, the appellate panel concluded that plaintiffs' claims were not barred by the remoteness doctrine, reasoning that the complaints sufficiently identified, for purposes of a proximate cause analysis, a link between plaintiffs' alleged damages and defendants' conduct.

## C.

We granted defendants' petition for certification, 185 *N.J.* 391, 886 *A.*2d 662 (2005), in order to address these several issues relating to the tort of public nuisance. Our consideration of this matter must begin with an explanation of the historical background of lead paint and with a review of the statutory responses to the public health impact of lead at the federal and state levels. We next consider separately the history and modern development of the common law tort of public nuisance. With that historical and legislative framework in mind, we then consider whether plaintiffs' complaints sound in public nuisance, whether these complaints are consistent with or barred by the Legislature's intent as expressed in the Lead Paint Act, and whether, in actuality, the complaints sound not in public nuisance but in products liability.

## II.

For purposes of the proceedings that have given rise to this appeal, many of the facts and much of the historical data relating to lead paint and lead pigments are not contested. We recite them here only to explain the context in which this dispute arises.

## A.

Lead is a naturally occurring metal. Centers for Disease Control and Prevention (CDC), *Third National Report on Human*

*Exposure to Environmental Chemicals* 38 (2005). For many years, lead has been used for a wide variety of purposes and has found numerous applications, including use in batteries, paints, glassware, and plastics. *Ibid.*

Lead, however, has also been linked to serious health effects. The most recent annual report prepared by the New Jersey Department of Health and Senior Services (DHSS) describes lead paint and the risk it poses as follows:

> When absorbed into the human body, lead affects the blood, kidneys and nervous system. Lead's effects on the nervous system are particularly serious and can cause learning disabilities, hyperactivity, decreased hearing, mental retardation and possible death. Lead is particularly hazardous to children between six months and six years of age because their neurological system and organs are still developing. [*Childhood Lead Poisoning in New Jersey: Annual Report* 4 (2005) [hereinafter *Annual Report* ].]

In addition, according to the United States Department of Health and Human Services, children tend to absorb lead more readily than do adults, because most lead ingested by adults is excreted, while children typically only excrete about one-third of the lead they ingest. *See* Agency for Toxic Substances & Disease Registry, *Draft Toxicological Profile for Lead* 8 (2005).

Because "[l]ead was removed from gasoline in the United States in the early 1980's ... the level of lead in the air and thereby the amount inhaled by children" has been greatly reduced. *See Annual Report, supra,* at 4. In 2000, the CDC warned that the primary lead hazard for children today comes from lead-based paint, particularly in homes, where it is the major source of lead exposure among children nationwide. *See Recommendations for Blood Lead Screening of Young Children Enrolled in Medicaid* 2 (*Morbidity & Mortality Wkly Rep.* Vol. 49, 2000) [hereinafter *Recommendations* ]. More specifically, the presence of "leaded paint that is peeling, chipping, or otherwise in a deteriorated condition; [and] lead-contaminated dust created during removal or disturbance of leaded paint in the process of home renovation" places children "at particularly high risk." *Annual Report, supra,* at 4. At the same time, the United States Environmental Protec-

tion Agency has continued to advise that "[l]ead-based paint is usually not a hazard if it is in good condition, and it is not on an impact or friction surface, like a window." *Protect Your Family from Lead in Your Home* 5 (2003).

Although lead-based paint was banned in the United States in 1978, *see* 16 *C.F.R.* § 1303.1, most homes constructed in the United States before 1978 contain some lead paint, U.S. Dep't of Hous. & Urban Dev. (HUD), *Lead Paint Poison: Is Your Family at Risk?* (2001), and lead exposure in children today most commonly results from their "chronic ingestion of lead-contaminated dust." *Recommendations, supra,* at 2. Despite the decline in average blood lead levels among the population of the United States, as of 2000, the CDC considered childhood lead exposure to be "a major environmental health problem." *Id.* at 3.

According to DHSS, houses in New Jersey built before 1950, "when paints contained a very high percentage of lead," present the "highest risk" of lead poisoning for children. *Annual Report, supra,* at 4. As of 2005, DHSS estimated that thirty percent of all housing in our State, comprising nearly one million housing units, was built before 1950. *See ibid.* However, through our statewide testing and abatement program, the percentage of children who underwent lead poisoning testing has increased. *Id.* at 7. Additionally, the percentage of children with elevated blood levels identified through our testing programs has continued to decline. *Id.* at 16–20.

Although the focus of the lead poisoning control efforts by all levels of government has been largely on lead paint in housing, other sources of lead contamination are well known. The New Jersey Department of Community Affairs (DCA) continues to warn residents that homes built prior to 1987 may also include lead-soldered plumbing lines, which may be a source of lead in their drinking water. *See Frequently Asked Questions: Lead Hazard Assistance (LHCA) Fund* (2007).[4] Other sources of lead

---

4 Available at http://www.state.nj.us/dca/dcr/leadsafe/lhcafaq.shtml.

contamination include "old painted toys and furniture[,] ... food and liquids stored in lead crystal or ... pottery[,] ... [h]obbies that use lead[,] ... [and] folk remedies." *Ibid.* In addition to these sources, the CDC has recently warned of lead contaminated toys, children's jewelry, and imported candies, *see Lead Program: Frequently Asked Questions,*[5] and the New York City Health Department has released an alert concerning lead-based cosmetics, Press Release, New York City Dep't of Health & Mental Hygiene, *Health Department Warns New Yorkers Not to Use Imported Eye Makeup that Contains Lead* at 1 (Apr. 26, 2007).

### B.

Congress first addressed the nationwide problem of lead paint exposure in 1971 through the passage of the Lead-based Paint Poisoning Prevention Act (LPPPA), Pub.L. No. 91–695, 84 Stat. 2078 (1971) (formerly codified at 42 *U.S.C.A.* §§ 4801 to 4846 (1971)). Initially, the LPPPA authorized a series of grants to discover the extent of the effects of lead exposure in children. *See ibid.; see also Ashton v. Pierce,* 716 *F.*2d 56, 58 (D.C.Cir.1983). At the same time, Congress authorized the HUD Secretary to promulgate regulations to eliminate the harms of lead-based paint from federally-owned or -funded housing. *See Ashton, supra,* 716 *F.*2d at 58–59. Through amendments to the LPPPA, and through promulgating increasingly strict regulations, by the late 1970s, the federal government had effectively banned the general use or sale of paint containing lead and was moving "to eliminate as far as practicable" the existing hazards in federal housing. *Ibid.*

Thereafter, the LPPPA was further expanded and supplemented, including through the 1992 passage of the Residential Lead-based Paint Hazard Reduction Act (RLPHRA), Pub.L. No. 102–550, 106 Stat. 3897 (1992) (codified at 42 *U.S.C.A.* §§ 4851 to 4856 (1992)). That Act sought to address the continuing problem of deteriorating lead paint in residential units throughout the coun-

---

[5] Available at http://www.cdc.gov/nceh/lead/faq/FAQs.htm.

try. *See* 42 *U.S.C.A.* § 4851(6). As a part of its legislative findings, Congress recognized that federal assistance to create an appropriate infrastructure was still required. *See* 42 *U.S.C.A.* § 4851(8). The RLPHRA therefore created a system of grants for the purpose of educating the public, identifying housing with lead contamination, and remediating the hazard in certain target housing. *See* 42 *U.S.C.A.* § 4852(e). Congress has continued to appropriate funds for these programs since that time. *See, e.g.,* Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia, and Independent Agencies Appropriations Act of 2006, Pub.L. No. 109–115, 219, 119 Stat. 2396, 2456 (2005).

## C.

New Jersey also responded to the problem posed by lead paint through the 1971 enactment of legislation known as the Lead Paint Act. *See L.* 1971, *c.* 366 (originally codified at *N.J.S.A.* 24:14A–1 to–12). The sponsor of the bill that eventually became the Lead Paint Act described the purposes of the Act and the concerns that motivated its passage as follows:

> The incidence of the disease of lead poisoning especially among children in substandard housing has become a major public concern both in our State and at the Federal level. There is presently pending in the United States Senate a bill [subsequently enacted as the LPPPA], passed by the House of Representatives which would provide Federal funding for up to 75% of the cost of certain local lead poisoning screening programs and State-conducted demonstration and research projects designed to study the extent of the lead-based paint poisoning problem and the methods for lead-based paint removal.

> This bill is designed to set up a comprehensive program both at the State and local level to eliminate the causes of lead poisoning in New Jersey, to treat the incidents thereof, and to enable both State and local government units to take advantage of Federal funding for such programs.

> [*Statement to Senate Bill No. 998,* at 3 (Dec. 10, 1970).]

As initially enacted, the Lead Paint Act prohibited anyone from "knowingly apply[ing] lead paint to toys, furniture, or the exposed interior surfaces of any dwelling ... or facility occupied ... by children." *L.* 1971, *c.* 366, § 1 (codified at *N.J.S.A.* 24:14A–1). The Act made violations a disorderly persons offense. *See id.* at

§ 3 (codified at *N.J.S.A.* 24:14A–3). In addition, the Act included a provision that declared the "presence of lead paint upon the interior of any dwelling causing a hazard to the occupant . . . to be a public nuisance," *id.* at § 5 (codified at *N.J.S.A.* 24:14A–5), and vested "primary responsibility" for investigating and enforcing the Act in local boards of health, *id.* at § 6 (codified at *N.J.S.A.* 24:14A–6).

Included among the Lead Paint Act's specific directives is the mandate that when a local board of health finds a dwelling with lead paint and finds that any person living there has an elevated level of lead in his or her blood, it "shall at once notify the owner that he [or she] is maintaining a public nuisance" and shall order the owner to abate the condition. *Id.* at § 8 (codified at *N.J.S.A.* 24:14A–8). In the event that the owner does not comply, the Act directs the local board of health to abate the condition at the owner's expense and authorizes both a civil cause of action against the owner and a lien on the property to ensure that the owner reimburses the local board of health for its expenses. *See id.* at § 9 (codified at *N.J.S.A.* 24:14A–9). Finally, the Act authorized the State Department of Health to promulgate implementing regulations, *see id.* at § 11 (codified at *N.J.S.A.* 24:14A–11), and vested it with the following duties:

> the responsibility for the development, implementation and coordination of a program to control lead poisoning by promoting research into methods of identifying areas wherein there is a high risk of the presence of lead paint in a dwelling, by setting up screening procedures for the detection of the presence of lead in persons and dwellings and stimulating professional and public education concerning the condition of lead poisoning.
>
> [*Id.* at § 12 (codified at *N.J.S.A.* 24:14A–12) (repealed and replaced in 1985).]

The statute was amended in 1976, essentially for the purpose of extending its reach to encompass "any facility occupied or used by children" by expanding the definition of "dwelling." *L.* 1976, *c.* 116, § 3 (codified at *N.J.S.A.* 24:14A–4d). This amendment was largely based on our Legislature's effort to ensure that lead paint in buildings being used as "nursery schools, day care centers and similar facilities" was included within the enforcement provisions

of the Act. Senate Law, Public Safety and Defense Committee, *Statement to Senate Bill No. 152* (Apr. 23, 1976).

In 1985, the Legislature, through the Lead Poisoning Abatement and Control Act, amended the Lead Paint Act to expand the directives to the State Department of Health that were formerly included in Section 12. *See L.* 1985, *c.* 84, § 10. In short, the Legislature repealed the general directive relating to creation of a lead poisoning program and enacted a far more detailed program to be established by the Department of Health. *See L.* 1985, *c.* 84 (codified at *N.J.S.A.* 26:2–130 to–137). As part of this enactment, the Legislature appropriated funds to assist the Department of Health in fulfilling its mandate, *see id.* at § 9, and directed the Commissioner of Health to "prepare a comprehensive plan to control lead poisoning" no later than September 25, 1985, *see id.* at § 5 (codified at *N.J.S.A.* 26:2–134). The Commissioner was also required to submit a report and recommendation to the Legislature and the Governor annually thereafter. *See id.* at § 6 (codified at *N.J.S.A.* 26:2–135).

In 1995, the Legislature again addressed the lead poisoning problem. Concluding that screening of pre-school children for lead poisoning was essential and that identifying the children at risk was necessary, the Legislature created a "universal lead screening program." *L.* 1995, *c.* 328 (codified at *N.J.S.A.* 26:2–137.2 to–137.7). Although the program was to be implemented and overseen by the Department of Health, primary responsibility for testing was placed on physicians, registered professional nurses, and health care facilities, with a directive to the Department of Health to attempt to maximize available federal funding to defray the costs. *See id.* at § 3 (codified at *N.J.S.A.* 26:2–137.4).

Finally, in 2003, the Legislature enacted the Lead Hazard Control Assistance Act (LHCAA), *L.* 2003, *c.* 311 (codified at *N.J.S.A.* 52:27D–437.1 to–437.15). The LHCAA provided for further assistance in lead paint remediation through the creation of the Lead Hazard Control Assistance Fund and the Emergency Lead Poisoning Relocation Fund. *See id.* at §§ 4, 9 (codified at

*N.J.S.A.* 52:27D–437.4,–437.9). These low-cost loan and grant programs, together with the creation of a registry of lead-safe housing, *see id.* at § 7 (codified at *N.J.S.A.* 52:27D–437.7), not only provided homeowners and owners of certain multi-family dwellings with financial assistance for abatement of existing lead in those premises, but created a database from which lead-safe housing could be identified. At the same time, the LHCAA required that all dwellings subject to inspections pursuant to *N.J.S.A.* 55:13A–13—with the exception of dwellings constructed during or after 1978, seasonal rental units, and owner-occupied dwellings—be inspected for "lead hazard control work." *Id.* at §§ 10, 12 (codified at *N.J.S.A.* 52:27D–437.10,–437.12). It also required the fees charged for these inspections, as well as a portion of the taxes collected from sales of paint and similar materials, to be dedicated to the fund created by the LHCAA. *See id.* at §§ 10, 11 (codified at *N.J.S.A.* 52:27D–437.10,–437.11).

As this explanation of the several statutes demonstrates, the Legislature separated the statutory scheme for the abatement of lead paint in buildings from the programs devoted to the health care aspects of lead exposure and lead poisoning. Funding sources for addressing the health concerns arising from lead exposure are now both many and varied. In addition to Department of Health grants to local health departments, our Legislature has enacted statutes requiring health maintenance organizations, hospital services corporations, and insurers to provide for, or to cover the costs of, blood lead screening and resulting medical evaluation and treatment for lead-related disorders. *See, e.g., N.J.S.A.* 17:48–6m(a) (hospital service corporations contract); *N.J.S.A.* 17:48E–35.10 (health service corporation contracts); *N.J.S.A.* 17B:27–46.1 *l* (group health insurance policies); *N.J.S.A.* 17B:27A–7(e)(i) (individual health benefits plans); *N.J.S.A.* 17B:27A–19(k)(i) (small group insurance policies); *N.J.S.A.* 26:2J–4.10 (health maintenance organizations).

In contrast, under the Lead Paint Act, responsibility for the costs of abatement rests largely on the property owners. Indeed, that statute specifically empowers local boards of health to sue

owners to recover abatement costs. Although the LHCAA, the most recent of these statutes, provides for grants and low-cost loans to certain property owners, eligibility is limited, with the result that owners still bear much of the cost burden. Notably, the Legislature specifically directed that these programs be funded through increased inspection fees paid by owners and by a portion of the sales taxes attributable to currently-available paint products.

It is only in light of this statutory framework that the arguments of the parties concerning the viability of a cause of action sounding in public nuisance can be evaluated. We turn, then, to an examination of the elements of that common law tort and to its relationship to this statutory framework.

### III.

Our analysis of the common law tort of public nuisance and its relationship, if any, to the Lead Paint Act must begin with an examination of the historical underpinnings of the tort itself.

### A.

The common law tort of public nuisance, which one commentator has described as being "vaguely defined" and "poorly understood," Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 *U. Cin. L.Rev.* 741, 774 (2003), can be traced back for centuries, *see id.* at 790–806. By carefully examining the historical antecedents of public nuisance and by tracing its development through the centuries, clear and consistent parameters that define it as a cognizable theory of tort law become apparent. Through our use of this analytical methodology, however, we can only conclude that plaintiffs' loosely-articulated assertions here cannot find their basis in this tort. Rather, were we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance.

Even more notable, however, is the fact that, unlike plaintiffs' complaints, our Legislature's use of the term "public nuisance" in the Lead Paint Act is in keeping with the term's historical meaning and intent. As a consequence, were we to agree with the Appellate Division that there is a basis sounding in public nuisance for plaintiffs' assertions, we would be creating a remedy entirely at odds with the pronouncements of our Legislature.

## B.

We need not recount the earliest origins of the common law tort of public nuisance in great detail. Nevertheless, some brief discussion of its roots is necessary to explain its modern usage. Originally, public nuisance was created as a criminal offense, *see* William L. Prosser, *Private Actions for Public Nuisance,* 52 *Va. L.Rev.* 997, 999 (1966), which was used to allow public officials, acting in the place of the sovereign, to prosecute individuals or require abatement of activities considered to be harmful to the public, *see* Gifford, *supra,* 71 *U. Cin. L.Rev.* at 745–46. As the commentary to the *Restatement (Second) of Torts* notes, the historical focus of public nuisance prosecutions included attacking such behaviors as "keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes[,] . . . storage of explosives[,] . . . [operating] houses of prostitution[,] . . . [causing] loud and disturbing noises[,] . . . disseminat[ing] bad odors, dust and smoke[,] . . . [and] obstruction of a public highway or a navigable stream." *Restatement (Second) of Torts* § 821B comment b (1979).

Essential to the concept of public nuisance, as illustrated by these historical examples, is the "interference with the interests of the community at large." *Ibid.* In modern times, the criminal prosecution for such activities has been subsumed within a wide variety of statutes, and we no longer recognize the existence of a common law crime of public nuisance. *See N.J.S.A.* 2C:1–5(a) (abolishing common law crimes in favor of statutory enactments); *see also Restatement (Second) of Torts* § 821B comment c (1979) (noting elimination of common law crimes). Nevertheless, a com-

mon law tort remedy to redress public nuisance has been recognized in light of the fact that these same activities might also give rise to tort-based recoveries. *See Restatement (Second) of Torts* at § 821B comment b (1979).

Notwithstanding that development, the essential elements of public nuisance as a theory of tort recovery find their genesis in this historical basis in crime and criminal prosecution. *See* Gifford, *supra,* 71 *U. Cin. L.Rev.* at 781. This is not to suggest that the existence of a common law tort remedy sounding in public nuisance is a particularly modern development. Indeed, in spite of the suggestion of at least one commentator that the first formalized appearance of the tort of public nuisance, distinct from its criminal concepts, is found in the *Restatement (Second) of Torts, see id.* at 807–08, it appears that the concept of a common law tort of public nuisance can also be traced back to English common law, albeit of somewhat more recent vintage, *see* Denise E. Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury Rule,* 28 *Ecology L.Q.* 755, 796–800 (2001) (tracing English common law precedents of tort of public nuisance). Rather, our recognition of the nuisance concept's historical antecedents in criminal law gives us the context for our understanding of the meaning of the more modern tort principles.

Equally essential to the concept of a public nuisance tort, however, is the fact that it has historically been linked to the use of land by the one creating the nuisance. *See* Gifford, *supra,* 71 *U. Cin. L.Rev.* at 831–33. The link to land may arise either because the nuisance is on that person's land, as in a mosquito pond, or because an activity conducted on that land interferes with a right of the general public, as in a stream-polluting business. *See id.* at 832 (explaining that public nuisance claim may arise because of defendant's use of land or because "the defendant has interfered with the plaintiff's use and enjoyment of public land."). In either case, public nuisance has historically been tied to conduct on one's own land or property as it affects the rights of the

general public. This is not to say that the focus for public nuisance, like private nuisance, involves an interference by defendant with a particular plaintiff's use and enjoyment of his own land. *See Restatement (Second) of Torts* § 821B comment h (1979). Rather, the nuisance, traditionally arising on the defendant's land, must instead involve an interference with a public right. *See id.* at § 821B comment g.

## C.

Our modern concepts of public nuisance are set forth in the *Restatement (Second) of Torts*.[6] There, public nuisance is defined, *see id.* at § 821B; the persons or entities permitted to recover for a public nuisance, either to collect damages or to prosecute an abatement action, are specifically indicated, *see id.* at § 821C; public nuisance is distinguished from private nuisance, *see id.* at § 821D; and those who may recover for private nuisance are identified, *see id.* at § 821E, separately from those who may sue, as private plaintiffs, for a public nuisance, *see id.* at § 821C. Because much of the debate in this matter arises from confusion about the essential elements of the tort of public nuisance, and the basis for any cause of action arising from public nuisance, we address these concepts as they have developed.

Scholars familiar with the development of the *Restatement (Second)*, and with the adoption of the sections relating to public nuisance in particular, point to the influence of individuals and entities seeking an avenue for redress of environmental pollution in the development of those sections, which were not found in the first *Restatement. See* Antolini, *supra,* 28 *Ecology L.Q.* at 829–49; Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort,* 45 *Washburn L.J.* 541, 547–48 (2006). Although now largely subsumed in

---

[6] As our Appellate Division has noted "New Jersey typically gives substantial weight to the Restatement view, particularly in respect of issues it has not yet addressed." *H. John Homan Co. v. Wilkes–Barre Iron & Wire Works, Inc.,* 233 *N.J.Super.* 91, 98, 558 A.2d 42 (App.Div.1989).

statutory pronouncements, environmental tort litigation had its origins in concepts of public nuisance, and its influence in the language adopted in the *Restatement (Second)* is in part a reflection of early environmentalists' hopes of creating means to ensure broad-based avenues for pollution control. *See* Antolini, *supra,* 28 *Ecology L.Q.* at 829–48. Their influences are readily apparent, for example, in Section 821C(2)(c), which includes language authorizing suits by class representatives, consistent with then-developing federal standing jurisprudence. *See Restatement (Second) of Torts* § 821C comment j (1979); Antolini, *supra, 28 Ecology L.Q.* at 846–48.

While the influence of those concerned about tort-based grounds on which to pursue polluters played a role in the creation of the public nuisance sections of the *Restatement (Second),* the definitional language nonetheless continues to adhere to the traditional notion that the tort of public nuisance fundamentally involves the vindication of a right common to the public. The *Restatement (Second)* defines a public nuisance as follows:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

[*Restatement (Second) of Torts* § 821B (1979).]

Although it might appear that the tort is expressed in rather general terms, those terms are not without meaning. In particular, the right with which the actor has interfered must be a public right, in the sense of a right "common to all members of the general public," rather than a right merely enjoyed by a number, even a large number, of people. *Id.* at § 821B comment g.

In explaining the difference between an interference with a common right and an interference with a right merely enjoyed by a large number of people, the *Restatement (Second)* provides the following example:

> A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured. Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance.
> [*Ibid.*]

The notion of the public right or common right that might be vindicated through a public nuisance action has two aspects that have been the focus of attention among scholars. First, of course, is the definition of the public right or common right itself since it fixes the parameters of any claim sounding in public nuisance. *See, e.g.,* Schwartz & Goldberg, *supra,* 45 *Washburn L.J.* at 562–64.

Second, however, and to some extent of more interest to the commentators, has been the distinction between public and private rights of action arising from public nuisance.[7] These distinctions are explained in Section 821C of the *Restatement (Second)* as follows:

> Who Can Recover for Public Nuisance
>
> (1) In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.
>
> (2) In order to maintain a proceeding to enjoin to abate a public nuisance, one must

---

[7] In referring to a private right of action sounding in public nuisance, we do not intend to refer to a private right of action for a private nuisance. The concept of a private nuisance, which is entirely different from a public nuisance, is addressed in the *Restatement (Second)* separately from the sections to which we refer. *See Restatement (Second) of Torts* §§ 821D, 821E, 822 (1979). Unlike public nuisance, a private nuisance involves an "invasion of another's interest in the private use and enjoyment of land." *Id.* at § 821D.

(a) have the right to recover damages, as indicated in Subsection (1), or

(b) have authority as a public official or public agency to represent the state or a political subdivision in the matter, or

(c) have standing to sue as a representative of the general public, as a citizen in a citizen's action or as a member of a class in a class action.

[*Id.* at § 821C.]

As this section illustrates, there is a distinction between suits for damages and proceedings for the injunctive remedy of abatement. *Compare id.* at § 821C(1) *with id.* at § 821C(2). The only basis for a money damage remedy arises in the context of a private action for public nuisance.

In considering who may sue to collect damages, by way of a private action for public nuisance, the focus of the scholars has been upon the *Restatement (Second)'s* continued adherence to the special injury rule. *See* Antolini, *supra,* 28 *Ecology L.Q.* at 844–54. Accordingly, a private plaintiff can sue for damages caused by the public nuisance only if the private plaintiff has "suffered harm of a kind different from that suffered by other members of the public." *Restatement (Second) of Torts* § 821C(1) (1979).

Although this Court has not considered the parameters of the tort of public nuisance in light of the *Restatement (Second)'s* formulation, we have previously adhered strictly to the requirement that a private plaintiff proceeding on a public nuisance theory demonstrate special injury. *See Poulos v. Dover Boiler & Plate Fabricators,* 5 *N.J.* 580, 587–89, 76 *A.*2d 808 (1950) (dismissing public nuisance complaint of property owner whose only claim was of greater inconvenience than that suffered by other members of the public).

Similarly, in published decisions, our trial and appellate courts have followed this traditional interpretation. *See Twp. of Howell v. Waste Disposal, Inc.,* 207 *N.J.Super.* 80, 98–99, 504 *A.*2d 19 (App.Div.1986) (affirming dismissal of township's common law public nuisance claim against polluter for want of standing); *Colon v. Tedesco,* 125 *N.J.Super.* 446, 455–56, 311 *A.*2d 393 (Law Div. 1973) (concluding that migrant farm worker demonstrated special injury supporting action in public nuisance in effort to enforce

statute regulating conditions at migrant labor camp); *Warren Foundry & Pipe Corp. v. Meriden Stone Co.*, 32 *N.J.Super.* 254, 108 *A.*2d 192 (App.Div.1954) (dismissing private claim for obstruction of public roadway because even great inconvenience to an individual is not special injury); *Gilmour v. Green Vill. Fire Dep't*, 2 *N.J.Super.* 393, 395, 63 *A.*2d 918 (Ch.1949) (awarding injunctive relief to landowner directly affected by lights on baseball field shining into his windows); *Baird v. Bd. of Recreation Comm'rs*, 110 *N.J. Eq.* 603, 604–05, 160 *A.* 537 (E. & A.1932) (finding that plaintiff who claimed that his peace was disturbed by Sunday baseball games on public lands suffered no special injury); *Mosig v. Jersey Chiropodists, Inc.*, 122 *N.J. Eq.* 382, 386, 194 *A.* 248 (Ch.1937) (rejecting application for injunction by individual chiropodists against unlicensed practitioners for want of special injury).

Under the *Restatement (Second)'s* formulation, if a private plaintiff has a right to sue for damages because of a harm different in kind, then that party may also pursue an action to abate the nuisance as it affects all members of the public. *See Restatement (Second) of Torts* § 821C(2)(a) (1979). Conversely, however, the public entity, as the modern representative of the sovereign in public nuisance litigation, has only the right to abate. *See id.* at § 821C(2)(b). Although historically that has included the right to visit upon the owner of the land from which the public nuisance emanates, the obligations, including the costs, of the abatement, *see City of Paterson v. Fargo Realty Inc.*, 174 *N.J.Super.* 178, 185, 415 *A.*2d 1210 (Cty. Dist.Ct.1980) ("It has long been recognized that a right to reimbursement will accrue to a municipality for its expenses in rightfully demolishing a building constituting a public nuisance."), there is no right either historically, or through the *Restatement (Second)'s* formulation, for the public entity to seek to collect money damages in general, *see Restatement (Second) of Torts* § 821C(1) (1979). Rather, there is only a private plaintiff's right to recover damages through an action arising from a special injury. *See ibid.*

 The significance, then, of the evolution of public nuisance law is threefold. First, a public nuisance, by definition, is related to conduct, performed in a location within the actor's control, which has an adverse effect on a common right. Second, a private party who has suffered special injury may seek to recover damages to the extent of the special injury and, by extension, may also seek to abate. Third, a public entity which proceeds against the one in control of the nuisance may only seek to abate, at the expense of the one in control of the nuisance. These time-honored elements of the tort of public nuisance must be our guide in our consideration of whether these complaints have stated such a claim. That analysis requires us to address not only the claims, but the nature of the plaintiffs, as well as the capacity in which they propose to proceed.

## IV.

Before we can accurately decide whether these complaints state a claim sounding in public nuisance, we must consider the implication of the Legislature's use of that term in the Lead Paint Act. Plaintiffs suggest, and the appellate panel agreed, that the Legislature's inclusion of a declaration of public nuisance in that statute supports the conclusion that plaintiffs therefore have a right to proceed in tort on that theory. This argument, however, is based upon the assumption that the declaration of public nuisance was general in scope and that the Legislature therefore intended to authorize, or at least did not intend to preclude, public entities' suits for damages.

## A.

We therefore consider what the Legislature intended when it declared in the Lead Paint Act that the presence of lead paint in buildings is a public nuisance. *See N.J.S.A.* 24:14A–5,–8. First, in discerning the intent of the Legislature, we consider the words employed. *See DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (noting that "best indicator of [legislative] intent is the

statutory language"). In light of the fact that public nuisance is itself a common law tort, we must decide whether the Legislature intended to refer to that tort or, as plaintiffs suggest, intended to use the term in some general, ill-defined, or colloquial meaning of the words "public nuisance."

We conclude that the Legislature's use of the term "public nuisance" can only have been intended in its strict historical sense. In general, technical terms, terms of art, and terms with existing legal meanings, "[i]n the absence of legislative intent to the contrary, or other overriding evidence of a different meaning" are understood to have been used in accordance with those meanings. 2A Norman J. Singer, *Sutherland Statutory Construction* §§ 47:29, 47:30 (6th ed.2000); *N.J.S.A.* 1:1–1 (declaring that "words having a special or accepted meaning in the law, shall be construed in accordance with [that] ... meaning."). The statute itself demonstrates faithfulness to the traditional meaning of public nuisance.

Central to our analysis of the Act in this regard are three fundamental aspects of the statute in terms of the common law meaning of public nuisance. First, the Legislature, in making the declaration of a public nuisance, attached to the activity so identified a criminal penalty, declaring that the use of lead paint would be a disorderly persons offense. *See N.J.S.A.* 24:14A–3. Second, the Legislature, in addressing the problem of lead paint, directed local boards of health to effect an abatement of the nuisance. *See N.J.S.A.* 24:14A–9. Finally, the Legislature, as a part of that remedy, directed that the owners of the premises where the public nuisance is found would be liable for the costs of the abatement. *See N.J.S.A.* 24:14A–7,–8,–9. In each of these respects, the Legislature addressed the lead paint problem in a manner completely in accord with our historical notions of public nuisance. By attaching a criminal penalty, by ordering an abatement through a public entity, and by maintaining a focus on the owner of premises as the actor responsible for the public nuisance itself, the Legislature's

approach remained tethered to the historical bases that have defined public nuisance dating back centuries.

Nor is there any basis on which we can conclude that the Legislature, in using the term "public nuisance" in the Act and in creating a remedial scheme consistent with the historical understanding of that term in both its criminal and tort antecedents, nonetheless expected that its use of that term would be the springboard for the expansive reading that plaintiffs suggest. Indeed, plaintiffs would have us read the Legislature's use of the term to incorporate not only its historical meaning, but to support any and all other understandings of the term as if it had no clear meaning at all. We do not understand the Legislature, in its careful approach to the lead paint problem, to have intended to sanction a tort-based theory of recovery essentially devoid of any of the tort's historical meaning.

Although our analysis of the Lead Paint Act and our Legislature's declaration of public nuisance does not suggest that the Legislature intended to create a public nuisance right of action more general than the one specified in the statute, we nonetheless must consider whether the appellate panel correctly concluded that these plaintiffs have stated a claim which was "complementary" and "parallel" to that legislative scheme. The inquiry requires us to return to the fundamental elements of the common law tort of public nuisance. We therefore must evaluate whether the wrong which plaintiffs seek to vindicate is an interference with a common right or merely an interference with a right enjoyed by a large number of people in the particular community. We then address the identity of defendants in terms of whether they qualify as actors whose conduct supports liability for creating the public nuisance. Apart from that, however, the issues before us also raise the question whether plaintiffs are proceeding as public or private litigants. The question is not insignificant, for if they are, strictly speaking, acting as private plaintiffs—to the extent that they are authorized to do so at all—they must demonstrate

that they have sustained a special injury. We address these fundamental issues in turn.

## C.

Although it could be persuasively argued that the Legislature's description of the public nuisance which lead paint creates is inconsistent with the traditional notion of an interference with a common right, we presume that the Legislature intended to base its declaration on Section 821B(2)(a) of the *Restatement (Second)*. That Section, in defining what constitutes "unreasonable" in terms of "an interference with a public right," refers to "conduct [which] involves a significant interference with the public health." *Restatement (Second) of Torts* § 821B(2)(a) (1979). To be sure, although one might debate whether the condition addressed truly affects a common right rather than merely affecting many people, there is ample room for the Legislature's interpretation of this meaning of "common right."

■ Even so, we find no ground for recognizing a public nuisance cause of action in plaintiffs' complaints. Assuming, based on the legislative declaration in the Lead Paint Act, that the continuing presence of lead paint in homes qualifies as an interference with a common right sufficient to constitute a public nuisance for tort purposes, plaintiffs' complaints fail nonetheless. Unlike the Legislature's adherence to traditional public nuisance motions, plaintiffs' complaints aim wide of the limits of that theory.

In examining the Lead Paint Act and its relationship to public nuisance generally, we find its focus on premises owners as the relevant actors to be instructive. The significance is that the presence of lead paint in buildings is only a hazard if it is deteriorating, flaking, or otherwise disturbed, and if it therefore can be ingested either directly or indirectly by being eaten, inhaled, or absorbed through the soil. Viewed in this light, we must conclude that the Legislature, consistent with traditional public nuisance concepts, recognized that the appropriate target of the abatement and enforcement scheme must be the premises

owner whose conduct has, effectively, created the nuisance. In public nuisance terms, it is the premises owner who has engaged in the "conduct [that] involves a significant interference with the public health," *id.* at § 821B(2)(a), and therefore is subject to an abatement action. The Legislature's clear focus on the owner of the premises as the party engaging in the conduct that gives rise to the nuisance is in careful accord with the historical meaning of the tort.

Contrary, however, to the Legislature's recognition of the required focus on conduct of the relevant actor, plaintiffs seek to base their complaints on conduct of another. This creates two insurmountable obstacles.

First, as we have seen, the conduct that has given rise to the public health crisis is, in point of fact, poor maintenance of premises where lead paint may be found by the owners of those premises. That conduct creates the flaking, peeling, and dust that gives rise to the ingestion hazard and thus creates the public nuisance. The Lead Paint Act's focus on owners maintains the traditional public nuisance theory's link to the conduct of an actor, generally in a particular location. Unlike the Legislature's careful adherence to these long-established notions, plaintiffs ignore the fact that the conduct that created the health crisis is the conduct of the premises owner. Plaintiffs therefore would separate conduct and location and thus eliminate entirely the concept of control of the nuisance.

Second, however, the very meaning of conduct in the public nuisance realm is separate, and entirely different, from the only conduct of these defendants. Fundamental to this aspect of our analysis is the fact that we here address an ordinary, unregulated consumer product that defendants sold in the ordinary course of commerce. In public nuisance terms, then, were we to conclude that plaintiffs have stated a claim, we would necessarily be concluding that the conduct of merely offering an everyday household product for sale can suffice for the purpose of interfering with a

common right as we understand it. Such an interpretation would far exceed any cognizable cause of action.

Although one might argue that the product, now in its deteriorated state, interferes with the public health, one cannot also argue persuasively that the conduct of defendants in distributing it, at the time when they did, bears the necessary link to the current health crisis. Absent that link, the claims of plaintiffs cannot sound in public nuisance. Indeed, the suggestion that plaintiffs can proceed against these defendants on a public nuisance theory would stretch the theory to the point of creating strict liability to be imposed on manufacturers of ordinary consumer products which, although legal when sold, and although sold no more recently than a quarter of a century ago, have become dangerous through deterioration and poor maintenance by the purchasers.

## D.

■ Even were we to conclude that the distribution of lead-based paint products constituted actionable conduct for purposes of permitting a tort-based recovery, we would nonetheless reject plaintiffs' complaints. As our explanation of public nuisance has made plain, the remedies available traditionally vary as between public and private plaintiffs. A public entity proceeding in public nuisance vindicates the common right and thus pursues either criminal penalties or civil actions to abate the nuisance at the property owner's expense. *See Restatement (Second) of Torts* § 821C(2) comment a (1979). A private plaintiff, on the other hand, does not necessarily sue to vindicate a public right, but seeks recompense for damages to the extent of the special injury sustained, apart from the interference with the public right. *See id.* at § 821C(1). The damage award, however, is limited to the extent of the special injury sustained by the private plaintiff, and is not a remedy available to a public entity plaintiff to the extent

that it acts in the place of the "sovereign." [8] *See id.* at § 821C(2)(b).

Applying these time-honored principles to plaintiffs leads inevitably to the conclusion that these complaints do not state a claim in public nuisance. First, the complaints seek damages rather than remedies of abatement. As such, they fall outside the scope of remedies available to a public entity plaintiff.[9] *See id.* at § 821C comment j. That being the case, these plaintiffs may only proceed in the manner of private plaintiffs. *See ibid.* Assuming that is permissible,[10] they must, therefore, identify a special injury as to which an award of money damages may attach.

---

[8] We do not intend to foreclose the possibility that, under other circumstances, a public entity could sue under a public nuisance theory as a private plaintiff. Here, however, where the Legislature has specifically directed public entities to undertake abatement and has also directed others to assist in providing services or funding to address the effects of the nuisance, we see no authority to permit it.

[9] Because plaintiffs' claim for damages cannot be sustained under traditional concepts of public nuisance, we need not address whether the municipal cost recovery rule would also prevent plaintiffs from recovering damages under a public nuisance theory. *See Twp. of Cherry Hill v. Conti Constr. Co.,* 218 *N.J.Super.* 348, 349, 527 *A.*2d 921 (App.Div.) (denying recovery on grounds that "government has traditionally assumed the ultimate cost of providing basic emergency services that protect the community"), *certif. denied,* 108 *N.J.* 681, 532 *A.*2d 253 (1987) (superseded, only to the extent that the analysis of *Cherry Hill* was based on the "fireman's rule," by *N.J.S.A.* 2A:62A–21).

[10] Whether these plaintiffs, as counties and municipalities, are authorized to sue for damages, instead of seeking abatement, is debatable. *See Mayor & Council of Borough of Alpine v. Brewster,* 7 *N.J.* 42, 53, 80 *A.*2d 297 (1951) (concluding that Legislature may give municipality power to abate a nuisance); *Kirsch Holding Co. v. Manasquan,* 24 *N.J.Super.* 91, 101, 93 *A.*2d 582 (App.Div. 1952) (noting that when Legislature grants police powers to municipalities, those municipalities may sue to abate a public nuisance). *But see James v. Arms Tech., Inc.,* 359 *N.J.Super.* 291, 820 *A.*2d 27 (App.Div.2003) (affirming denial of gun manufacturers' motion to dismiss public nuisance claim of thirty cities and counties seeking damages); *City of Milwaukee v. NL Indus., Inc.,* 278 *Wis.*2d 313, 691 *N.W.*2d 888 (App.2004) (allowing city to proceed on public nuisance theory against seller of lead paint for damages), *review denied,* 285 *Wis.*2d 631, 703 *N.W.*2d 380 (2005). Because our analysis of the requisite connection between

Plaintiffs, however, have not, and cannot, identify any special injury. Rather, all of the injuries plaintiffs have identified are general to the public at large. As we have seen, special injury has a specific and well-defined meaning in public nuisance jurisprudence. It must be an injury different in kind, rather than in degree. *See id.* at § 821C comment b; *Poulos, supra,* 5 *N.J.* at 586–87, 76 *A.2d* 808; *Baird, supra,* 110 *N.J. Eq.* at 605, 160 *A.* 537; *Mosig, supra,* 122 *N.J. Eq.* at 386, 194 *A.* 248. Because plaintiffs have confused private rights of action with public prosecutions, they have argued that they need not identify a special injury. At the same time, however, the only basis for damages that plaintiffs have identified are those directly arising from the common right. Those damages are inadequate to support a claim sounding in public nuisance.

## V.

█ Our analysis of both traditional and modern concepts of the tort of public nuisance demonstrates that plaintiffs' complaints cannot be understood to state such a claim. Equally supportive of that conclusion, however, is the inescapable fact that carefully read, the claims asserted would instead be cognizable only as products liability claims.

We begin with the Product Liability Act itself. As one commentator has noted: "[w]ith the passage of the Product Liability Act, *N.J.S.[A.]* 2A:58C–1 through–7, . . . there came to be one unified, statutorily defined theory of recovery for harm caused by a product, and that theory is, for the most part, identical to strict liability." William A. Dreier et al., *New Jersey Products Liability & Toxic Torts Law* § 1:2–1 (2007).

The language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other

---

damages and special injury supports our conclusion that these plaintiffs have not stated a claim, we need not address this separate issue.

products. *See N.J.S.A.* 2A:58C–1b(3) (defining "product liability action"). That language encompasses both the product at issue here and the harms plaintiffs attribute to that product. There can be no doubt that the paint products distributed or sold by defendants were intended to be used by consumers. Similarly, the harms plaintiffs seek to vindicate in this action are addressed in the context of a products liability claim. Those harms include "physical damage to property[,] ... personal physical illness [or] injury," and the like. *N.J.S.A.* 2A:58C–1b(2).

Were there any doubt about the essential nature of the claims asserted by plaintiffs, a careful reading would demonstrate that they sound in products liability causes of action. The central focus of plaintiffs' complaints is that defendants were aware of dangers associated with lead—and by extension, with the dangers of including it in paint intended to be used in homes and businesses—and failed to warn of those dangers. This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA. *See N.J.S.A.* 2A:58C–2. In light of the clear intention of our Legislature to include all such claims within the scope of the PLA, we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of that Act.

Even so, plaintiffs urge us to find a basis to permit them to proceed in public nuisance because the PLA includes an exception for "environmental tort actions." *See N.J.S.A.* 2A:58C–6. The PLA thus excludes claims seeking coverage for "harm where the cause of the harm is exposure to toxic chemicals or substances." *N.J.S.A.* 2A:58C–1b(4). We, however, disagree with the suggestion that lead paint exposure is an environmental tort within the meaning of the PLA's exception and thus amenable to litigation apart from the PLA.

In defining the environmental torts that fall outside of the scope of the PLA, the Act specifically provides that "environmental tort action ... does not mean actions involving drugs or products

intended for personal consumption or use." *Ibid.* The legislative history of the PLA itself is instructive to assist us in discerning the legislative intent regarding the environmental tort exception.[11]

The original version of the bill, S. 2805, and the sponsor's statement refer to the environmental tort exception solely in terms related to pollution. The bill defined an environmental tort action as follows:

> For the purposes of this section, "environmental tort action" means a civil action seeking damages for personal injuries or death where the cause of the damages is the discharge of hazardous or toxic substances into the air or water of the State or onto the lands from which it might flow into waters.
>
> [S. 2805, § 3 (introduced on Nov. 17, 1986).]

Similarly, the sponsor described the intended scope of the exception in like terms:

> The section includes a definition of the term "environmental tort action" that is intended to encompass actions involving pollution of the ambient air and of streams and other bodies of water, "dumping" of toxic wastes, and similar activities ordinarily regarded as environmental torts.
>
> [*Statement to Senate Bill No. 2805,* at 7–8 (Nov. 17, 1986).]

As finally enacted, the language was somewhat broader, *see N.J.S.A.* 2A:58C–1b(4), but its scope is explained in the Assembly Insurance Committee's Statement as follows:

> the act will not apply to actions for damages for harm resulting from environmental or occupational exposure to toxic chemicals or substances. The act is, however, intended to apply to all other actions involving product-related harm, including harm caused by chemicals or substances that are contained in drugs or products intended for personal consumption or use—that is, traditional consumer products such as foods, beverages, cosmetics, household appliances, and other articles intended for personal consumption or use.
>
> [*Statement to Senate Bill No. 2805,* at 1 (June 22, 1987).]

Nothing in the final language of the bill or in the above-quoted expression of intent suggests that lead-based paint sold for use in

---

[11] In particular, the PLA directs us to rely on the legislative history by its reference as follows: "such sponsors' or committee statements that may be adopted or included in the legislative history of this act shall be consulted in the interpretation and construction of this act." *N.J.S.A.* 2A:58C–1a. These materials are particularly instructive in our understanding of the environmental tort exception.

homes and buildings was meant to be excluded from the PLA as an environmental tort.

Our prior analysis of the environmental tort exception to the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to–5.17, is consistent with our understanding of the exception in the PLA. In *Stevenson v. Keene Corp.,* 131 *N.J.* 393, 620 *A.*2d 1047 (1993) (per curiam), we concluded that asbestos claims, by and large, fall within the environmental tort exception, because they involve workplace exposure to contaminated ambient air. *See id.* at 395–96, 620 *A.*2d 1047. In like manner, exposure to fungicides and similar substances in a work environment fall outside of the PLA. *See James v. Bessemer Processing Co.,* 155 *N.J.* 279, 295–96, 714 *A.*2d 898 (1998) (petroleum and chemical products residue); *Macrie v. SDS Biotech Corp.,* 267 *N.J.Super.* 34, 39 n. 1, 630 *A.*2d 805 (App.Div.), *certif. denied,* 134 *N.J.* 565, 636 *A.*2d 522 (1993) (fungicides); *cf. Magistrini v. One Hour Martinizing Dry Cleaning,* 109 *F.Supp.*2d 306, 310 n. 4 (D.N.J.2000), *aff'd,* 68 *Fed.Appx.* 356 (2003) (dry cleaning solvent).

However, in *Stevenson, supra,* we suggested the limits of the environmental tort exception as it relates to personal use of a toxic product. 131 *N.J.* at 393, 620 *A.*2d 1047. We posited that an oven cleaning product with a toxic ingredient that seeped into the user's hand through a cut would give rise to a cause of action covered by the PLA rather than an environmental tort claim excepted from its reach. *See ibid.* Similarly, lead paint sold to consumers and used generally in their homes and private buildings remains essentially a consumer product rather than a product used in an industrial context, which would create an environmental tort. We conclude, therefore, that the claim here sounds in products liability and does not fall outside of the scope of the PLA by virtue of the environmental tort exception.

Indeed, were we to recognize plaintiffs' right to pursue these manufacturers, we would create a cause of action entirely inconsistent with the PLA's comprehensive legislative scheme.

## VI.

Our Legislature, in recognizing the scope and seriousness of the adverse health effects caused by exposure to and ingestion of deteriorated lead paint, acted swiftly to address that public health crisis. Its careful and comprehensive scheme did so in conformity with traditional concepts of common law public nuisance. Nothing in its pronouncements suggests it intended to vest the public entities with a general tort-based remedy or that it meant to create an ill-defined claim that would essentially take the place of its own enforcement, abatement, and public health funding scheme. Even less support exists for the notion that the Legislature intended to permit these plaintiffs to supplant an ordinary product liability claim with a separate cause of action as to which there are apparently no bounds. We cannot help but agree with the observation that, were we to find a cause of action here, "nuisance law 'would become a monster that would devour in one gulp the entire law of tort.'" *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 *F*.3d 536, 540 (3d Cir. 2001) (quoting *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 *F*.2d 915, 921 (8th Cir.1993)). Although there may be room, in other circumstances, for an expanded definition of the tort of public nuisance, we find no basis in this record to conclude that these plaintiffs have stated such a claim.

## VII.

We reverse the judgment of the Appellate Division and remand this matter to the Law Division for entry of a judgment in favor of defendants.

Chief Justice ZAZZALI, dissenting.

This Court has a duty to reconcile outdated formulations of the common law with the complexities of contemporary society. *See Fox v. Snow*, 6 *N.J.* 12, 21–22, 76 *A.*2d 877 (1950). The common law must "stand ready to adapt as appropriate, to shape, redress, and remedy so as to answer measure for measure the particular

evil it pursues." *Tachiona v. Mugabe,* 169 *F.Supp.*2d 259, 318 (S.D.N.Y.2001), *rev'd on other grounds,* 386 *F.*3d 205 (2d Cir.2004).

Accordingly, I would not allow those responsible for polluting this State's residential environment to avoid liability simply because past applications of the public nuisance doctrine do not mirror the circumstances of this appeal. Because I find that the public nuisance doctrine is an appropriate and efficient means for vindicating the public's right to be free from the harmful effects of lead paint, I respectfully dissent.

## I.

Lead paint is a deadly toxin that permeates the structural environment of this State. The effects of lead poisoning are well-documented:

> Lead is highly toxic and affects virtually every system of the body. At high exposure levels, lead poisoning can cause coma, convulsions, and death. While adults can suffer from excessive lead exposures, the groups most at risk are fetuses, infants, and children under age six. At low levels, the neurotoxic effects of lead have the greatest impact on children's developing brains and nervous systems, causing reductions in IQ and attention span, reading and learning disabilities, hyperactivity, and behavioral problems. These effects have been identified in many carefully controlled research studies. However, the vast majority of childhood lead-poisoning cases go undiagnosed and untreated, since most poisoned children have no obvious symptoms.
>
> [*Office of Lead–Based Paint Abatement and Poisoning Prevention,* 61 *Fed.Reg.* 29170–71 (June 7, 1996) (citations omitted).]

Children need not ingest lead paint directly to be at risk. Because lead does not "dissipate, biodegrade, or decay," all lead paint not properly extracted remains in the State's environment, and children are not safe from exposure simply because their residence has been decontaminated. Comment, Karla A. Francken, *Lead Based Paint Poisoning Liability: Wisconsin Realtors, Residential Property Sellers, and Landlords Beware,* 77 *Marq. L.Rev.* 550, 559 (1994). Paint chips and particles pollute dust and soil, which children subsequently inhale or ingest. *See* Thomas F. Zimmerman, *The Regulation of Lead–Based Paint in Air Force Housing,* 44 *A.F. L.Rev.* 169, 172 (1998). The usual wear and tear

associated with the use of walls, windows, and doors introduces the toxin into our environment. *Ibid.* The federal Department of Housing and Urban Development, therefore, has identified lead poisoning as "the most common *environmental disease* of young children, eclipsing all other environmental health hazards found in the residential environment." *Office of Lead–Based Paint Abatement and Poisoning Prevention, supra,* 61 *Fed.Reg.* at 29170 (emphasis added) (internal citation and quotation omitted).

That contamination harms thousands of New Jersey's children. The most recent survey of blood-lead levels in New Jersey revealed that 3.12% of children tested were suffering from lead poisoning.[1] New Jersey Department of Health and Senior Services, *Childhood Lead Poisoning in New Jersey, Annual Report Fiscal Year 2003* 11 (2004) [hereinafter *Childhood Lead Poisoning* ]. As amicus Public Advocate of New Jersey observes, if that percentage is extrapolated across the relevant population, there are approximately 18,176 New Jersey children suffering from elevated blood levels. *Compare* Judy Peet, *The Danger Lurking Within, Star–Ledger* (Newark, N.J.), Nov. 4, 2001, at 21 (reporting number of poisoned children at 30,000). Children from underprivileged communities are most at risk because of the prevalence of older, dilapidated buildings within their communities. American Civil Liberties Union, *Preventing Childhood Lead Poisoning in New Jersey: Advocate and State Government Working Together to Increase the Lead Screening of Children* 2 (2005). Statistically, low-income children are eight times more likely to be poisoned than children from other income brackets, and an estimated sixty percent of all poisoned children are on Medicaid. *Ibid.*

---

[1] That percentage represents children who have blood-lead levels exceeding 10 ug/dl. Scientists have established that children with blood-lead levels greater than 10 ug/dl require treatment to avoid harmful effects, Zimmerman, *supra*, 44 *A.F. L.Rev.* at 169–70, and the federal Centers for Disease Control has adopted that number as the threshold for intervention, *Preventing Lead Poisoning in Young Children, A Statement by the Centers for Disease Control* 2 (2005).

Adding to the crisis are the logistical difficulties associated with abating lead paint contamination. Residential homes are widely recognized as the principal source of poisonous lead. *See, e.g.,* New Jersey Department of Health and Family Services, *Lead Poisoning Elimination Plan* 6 (2005). Prior to 1950, residential lead paint contained extremely high levels of lead pigment. *Childhood Lead Poisoning, supra,* at 50 (noting that some paints manufactured before 1950 contained fifty percent lead pigment). However, in 1978, the federal government banned the use of lead paint in residential homes. *Ban of Lead–Containing Paint,* 16 *C.F.R.* § 1303.1. Nevertheless, in 2003, the Legislature noted that "because of the age of New Jersey's housing stock, our State is among the states with the most serious risk of exposure from previous residential use of lead-based paint." *N.J.S.A.* 52:27D–437.2(d) (estimating that there are two million homes in New Jersey built before 1978, one million of which were built before 1950).

Most significant, however, is the staggering cost of decontamination. In 2001, the chairman of the State's Inter–Agency Task Force for Childhood Lead Poisoning Prevention estimated that it would cost New Jersey $50 billion to abate lead paint contamination. Peet, *supra,* at 21. The cost to private property owners is also prohibitive, with the decontamination of a single apartment costing as much as $12,000. *Ibid.*

In sum, New Jersey's residential environment is infected with a deadly toxin that affects our most vulnerable and cherished citizens: our children.

II.

Nevertheless, in its comprehensive opinion the majority concludes that the Legislature foreclosed plaintiffs' claims by enacting the Lead Paint Act and the Products Liability Act. The majority finds that plaintiffs' claims are "directly contrary to legislative pronouncements governing both lead paint abatement programs and products liability claims." *Ante* at 409, 924 *A.*2d at 487.

As a creature of the common law, the public nuisance tort exists independent of any legislative pronouncement. Although a "statute may take away a common law right, ... there is a presumption that the Legislature had no such intention," *De Fazio v. Haven Sav. & Loan Ass'n*, 22 *N.J.* 511, 519, 126 *A.2d* 639 (1956) (quoting 3 Sutherland, *Statutory Construction* § 6201 (3d ed.1943)); *accord Velazquez v. Jiminez*, 172 *N.J.* 240, 256, 798 *A.2d* 51 (2002). A statute should be interpreted to subsume pre-existing common law remedies only if that intention is "clearly and plainly expressed." *Velazquez, supra*, 172 *N.J.* at 257, 798 *A.2d* 51.

The Lead Paint Act, *N.J.S.A.* 24:14A–1 to–12, demonstrates no intention to foreclose alternative tort remedies. In fact, the Act does not even concern tort liability. Rather, it is an enabling statute authorizing local health boards to enforce lead paint regulations. *See N.J.S.A.* 24:14A–9 (vesting municipalities with jurisdiction to enforce Lead Paint Act). The Act's purpose is to ensure appropriate governmental regulation of lead paint removal and detection. *See N.J.S.A.* 24:14A–11 (authorizing commissioner to promulgate lead paint regulations "necessary to effectuate the purposes of this act"). Nowhere does the Lead Paint Act express an intention to foreclose pre-existing common law remedies that would supplement the eradication of lead paint. *See L.* 1971, *c.* 366 (describing Lead Paint Act as "[a]n act prohibiting the use of lead paint in certain circumstances, providing remedies and penalties for violation thereof").

I am in substantial agreement with the Appellate Division's conclusion that "to allow plaintiffs' claim to proceed would not subvert the goals of the Lead Paint Act, and, in fact such action would foster those goals." The Lead Paint Act and the public nuisance doctrine are complementary mechanisms aimed at the same evil. The Lead Paint Act permits local governments to enforce lead paint regulations, *N.J.S.A.* 24:14A–9A, and a public nuisance claim enables municipalities to recoup the cost of abatement from those responsible for creating the nuisance in the first

place. Thus, this Court should not infer that the Legislature intended to derogate the common law by enacting the Lead Paint Act.[2]

Regarding the Products Liability Act, *N.J.S.A.* 2A:58C–1 to–11, the majority concludes that the Products Liability Act precludes plaintiffs' claims because lead paint is not an *environmental* crisis. The Legislature intended the Products Liability Act to govern all product liability claims, with one express exemption for "environmental tort action[s]." *N.J.S.A.* 2A:58C–6. The Act defines an environmental tort action as "a civil action seeking damages for harm where the cause of the harm is exposure to toxic chemicals or substances, but does not mean actions involving drugs or products intended for personal consumption or use." *N.J.S.A.* 2A:58C–1(b)(4).

Plaintiffs' allegation that defendants intentionally polluted residential buildings is a fitting example of an environmental tort. Defendants manufactured toxic lead pigment for application to New Jersey's buildings. Plaintiffs allege that defendants were aware of lead's toxicity and knowingly introduced it into the structural environment of this State. Consequently, lead paint permeates many of our residences. I see no significant distinction between the scenario presented in this appeal and traditional environmental torts where pollutants are introduced into some other aspect of the physical environment, such as the air or water. *See Statement to Senate Bill No. 2805,* 7–8 (Nov. 17, 1986) (stating that "environmental tort exception" was "intended to encompass actions involving pollution of the ambient air and of streams and

---

[2] The majority also makes extensive reference to the Lead Paint Act in its analysis of the *common law* elements of the public nuisance tort. *Ante* at 431–34, 924 A.2d at 500–02. Because the public nuisance tort emanates from the common law, the Lead Paint Act is of limited or no relevance to a discussion of a common law claim. *See* 58 *Am.Jur.2d Nuisances* § 59 (2002) ("Statutes defining nuisances generally do not change the common-law definition of the term.... Such statutes do not modify or abrogate the common law."). Rather, the Lead Paint Act is an enabling statute that sheds no light on the appropriate scope of the public nuisance tort.

other bodies of water, 'dumping' of toxic wastes, and similar activities").

In my view, *Stevenson v. Keene Corp.*, 131 *N.J.* 393, 395, 620 *A.*2d 1047 (1993) is controlling in this appeal. There, we held that the environmental tort exception applied to a negligence claim against asbestos manufacturers. We affirmed the Appellate Division's conclusion that "there can be no question but that the product itself and the risks it poses to people when introduced into the environment are both toxic and hazardous." *Stevenson v. Keene Corp.*, 254 *N.J.Super.* 310, 320, 603 *A.*2d 521 (App.Div.1992). There is no meaningful difference between the manufacturing of asbestos and the production of toxic lead pigment.

Further, the lead paint dilemma is not analogous to injuries sustained from products that are "intended for personal consumption or use." *N.J.S.A.* 2A:58C–1(b)(4). In *James v. Bessemer Processing Co.*, 155 *N.J.* 279, 295–96, 714 *A.*2d 898 (1998), we held that the environmental tort exception applied because, although the defendants manufactured petroleum products for personal consumption, the plaintiff, who was not a consumer but a worker who cleaned drums containing the products, was harmed by prolonged exposure to pollutants emanating from the defendants' products.

Here, the injured parties are also not consumers, but unsuspecting children who are exposed to ambient lead pollutants decades after the paint was originally purchased by consumers. What remains is an environmental disaster that poisons innocent children. The environmental tort exception to the Products Liability Act was intended to apply in such circumstances.

Accordingly, I do not believe that the Legislature foreclosed plaintiffs' claim by enacting either the Lead Paint Act or the Products Liability Act. Absent the Legislature's express declaration to the contrary, this Court should not infer the intent to eradicate a common law right of recovery. *Velazquez, supra,* 172 *N.J.* at 256, 798 *A.*2d 51. Because neither statute expressly

abrogates the common law right at issue in this appeal, I would permit plaintiffs to assert their public nuisance claims.

### III.

Broadly defined, a public nuisance is "an unreasonable interference with a right common to the general public." *Restatement (Second) of Torts* § 821B (1979). The majority holds that plaintiffs' public nuisance claim must fail because it exceeds the "well-recognized parameters of that tort." *Ante* at 409, 924 *A.*2d at 487. The majority relies on the "time-honored" principle that "a public entity ... may only seek to abate at the expense of the one in control of the nuisance." *Id.* at 429, 924 *A.*2d at 499. According to the majority, the common law doctrine of public nuisance is not applicable in this appeal because plaintiffs, by virtue of their public status and the general injuries they allege, may seek only abatement as a remedy, *id.* at 428, 435, 924 *A.*2d at 498, 502 and because defendants do not retain control of the property hosting the nuisance, *id.* at 429, 924 *A.*2d at 499. However, that application of the public nuisance doctrine conflicts with sound policies underlying public nuisance principles and, more important, permits those allegedly responsible for contaminating New Jersey to avoid responsibility for curing the infection.

The control element, on which the majority rests its decision, is grounded on the assumption that only injunctive relief is appropriate in public nuisance cases brought by public entities. Consequently, pursuant to that assumption, the only appropriate defendants are those who retain control of the nuisance at the time of abatement. *See, e.g., Roseville Plaza Ltd. P'ship v. U.S. Gypsum Co.,* 811 *F.Supp.* 1200, 1210 (E.D.Mich.1992) (holding that once defendant lost legal right to abate, public nuisance claim was moot). Thus, in jurisdictions where the control element has been adopted, the public nuisance doctrine does not serve a punitive or preventive function. *See* Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort,* 71 *U. Cin. L.Rev.* 741, 819–21 (2003) (collecting cases). Rather, the public nuisance tort is

exclusively a corrective instrument that enables municipalities to stop a continuing noxious use. *See, e.g., City of Philadelphia v. Beretta U.S.A. Corp.,* 126 *F.Supp.*2d 882, 911 (E.D.Pa.2000).

Historically, however, a public nuisance action served both a punitive or preventive function and a corrective purpose. *See People ex rel. Gallo v. Acuna,* 14 *Cal.*4th 1090, 60 *Cal.Rptr.*2d 277, 929 *P.*2d 596, 602–03 (1997) (providing historical account of public nuisance doctrine); *see also* W. Page Keeton et. al., *Prosser and Keeton on Torts* § 90 (5th ed.1984) (discussing origins of public nuisance remedies). The public nuisance doctrine originated as a crime against the crown under English law and did not require an element of control by the offender. *Acuna, supra,* 60 *Cal.Rptr.*2d 277, 929 *P.*2d at 603. It was essentially penal in nature, imposing sanctions on anyone who polluted public spaces. *Ibid.* Culpability hinged on whether the offender was responsible for creating the nuisance. *Ibid.*

And so, consistent with the punitive and corrective functions of the public nuisance doctrine, various courts have rejected the majority's application of the control element. *See, e.g., N.J. Dep't of Envtl. Prot. & Energy v. Gloucester Envtl. Mgmt. Servs.,* 821 *F.Supp.* 999, 1012 (D.N.J.1993) ("It is enough for a nuisance claim to stand that the [defendants] allegedly contributed to the creation of a situation which, it is alleged, unreasonably interfered with a right common to the general public."); *Friends of Sakonnet v. Dutra,* 738 *F.Supp.* 623, 633 (D.R.I.1990) ("This court has discovered no [state] precedent that bars recovery of nuisance damages simply because the defendants no longer control the instrumentality."); *Anderson v. W.R. Grace & Co.,* 628 *F.Supp.* 1219, 1222 (D.Mass.1986) (holding defendants liable even though they did not control nuisance); *County of Santa Clara v. Atl. Richfield Co.,* 137 *Cal.App.*4th 292, 306, 40 *Cal.Rptr.*3d 313 (2006) ("[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property"). Those courts have held that defendants are liable for abatement costs if they contributed to the creation of the nuisance, even if the defendant no longer has

control over the property where the nuisance exists. *County of Santa Clara, supra,* 137 *Cal.App.* 4th at 306, 40 *Cal.Rptr.*3d 313 ("[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance."); *See North Carolina ex rel. Howes v. W.R. Peele, Sr. Trust,* 876 *F.Supp.* 733, 741 (E.D.N.C.1995) ("The person who creates the nuisance is liable and that liability continues as long as the nuisance exists.").

In my view, that precedent represents the proper application of the public nuisance doctrine because it prevents the exploitation of the public and shifts the cost of abatement to those responsible for creating the nuisance. Compared to the communities suffering from the nuisance's harmful effects, the parties that created the problem are better suited to finance the abatement because they profited from the pollution of the community. Here, plaintiffs allege that defendants are partially responsible for creating New Jersey's lead paint crisis because they knowingly distributed toxic lead pigment. If those allegations are proven true, it is entirely proper to require defendants to bear the cost of abatement.

Therefore, a claim for public nuisance should exist if the defendant is responsible for creating the nuisance and, by virtue of the unjust benefit derived from the nuisance, can fairly be required to fund abatement. That application of the public nuisance tort remains true to the doctrine's corrective purpose because it enables municipalities with limited resources to finance abatement. Monetary damages apportioned by fault also serve a preventive function because they provide disincentives for parties to knowingly exploit the public.

## IV.

I add only this. The majority correctly notes that the conduct that has given rise to the public health crisis is, in point of fact, poor maintenance of premises where lead paint may be found by the owners of those

> premises. That conduct creates the flaking, peeling, and dust that give rise to the ingestion hazard and thus creates the public nuisance.
>
> [*Ante* at 433, 924 *A.*2d at 501.]

However, that perspective sidesteps the harsh reality of the lead paint crisis. Decades ago, lead paint was applied to buildings throughout this State. As the harmful effects of lead paint became public, those who could afford its removal or proper maintenance did so. The dangerous lead paint that remains in our physical environment exists primarily in underprivileged, residential communities where home owners and municipalities cannot afford the exorbitant costs of decontamination. *See* American Civil Liberties Union, *supra*, at 2. Those citizens and communities should not be portrayed as the cause of a public health crisis; they are the victims. More important, defendants should not be shielded from liability by recasting the reality of the lead paint problem. If plaintiffs' allegations are proven true, defendants should bear the burden of remediation.

## V.

In an ordered society, one purpose of the law, particularly the common law of torts, is to provide a corrective mechanism for injustice. *See* Keeton et. al., *supra*, at 15. Common law claims must keep step with the schemes of those who would unfairly profit at the expense of others. It is our responsibility to ensure that formalistic distinctions and outdated definitions do not thwart justice. Rather, we must mold the common law to the unanticipated injustices that inevitably arise as our society advances through time. Our duty is "[t]o sustain, to repair, to beautify this noble pile" that is the common law. 4 William Blackstone, *Commentaries on the Law of England* 436 (1765–69).

The tragedy of the lead paint crisis is that it was and is entirely preventable. The only impediment to purging New Jersey of lead paint is the financial cost. The majority's holding unfairly places the cost of abatement on taxpayers and private property owners, while sheltering those responsible for creating the problem. Because the common law doctrine of public nuisance is an appropri-

ate means of shifting the cost of abatement to those who unfairly profited at the expense of the general public, I respectfully dissent.

Justice LONG joins in this opinion.

*For reversal and remandment*—Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—4.

*For affirmance*—Chief Justice ZAZZALI and Justice LONG—2.

Not Participating—Justice ALBIN.